BENCH v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:BENCH v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 BENCH v. STATE
2018 OK CR 31
Case Number: D-2015-462
Decided: 10/04/2018
MILES STERLING BENCH, Appellant v. THE STATE OF OKLAHOMA, Appellee.
Cite as: 2018 OK CR 31, __ __

 

 

OPINION

LUMPKIN, PRESIDING JUDGE:

¶1 Appellant, Miles Sterling Bench, was tried by jury and convicted of First Degree Murder (21 O.S.2011, § 701.7(A)) in the District Court of Stephens County, Case Number CF-2012-172. The jury found the presence of two aggravating circumstances: 1) the murder was especially heinous, atrocious, or cruel, and 2) the defendant posed a continuing threat to society, and set punishment as death. The trial court formally sentenced Appellant in accordance with the jury's verdict. Appellant now appeals his conviction and sentence.[1]

FACTS

¶2 Appellant began working at the Teepee Totem convenience store in the town of Velma, Stephens County in May of 2012. He was twenty-one years old. Appellant lived outside of town with his grandparents. His cousin, Clayton Jenson, regularly drove him to work.

¶3 After three weeks of training, Appellant began to close the store by himself. On June 6th, Jenson drove Appellant to work. They visited for 2 hours beforehand and discussed Appellant's plan to go to California so Appellant could be a mixed martial arts ("MMA") fighter. Jenson dropped Appellant off shortly before 2:00 p.m. Other than a sore throat, Appellant seemed absolutely normal to Jenson that day.

¶4 Sixteen-year-old Braylee Henry drove into Velma around 7:30 p.m. to get an item from the grocery store. After completing this task, Henry went into the Teepee Totem to get some candy and a soda fountain drink. Through Appellant's admissions to his psychological expert, we know that Appellant attacked Henry while she was filing a cup at the fountain. He struck Henry and took her to the ground. He strangled Henry with a choke hold and dragged her into the store's stockroom.

¶5 Henry played basketball for her school and was in good shape. Once inside the storeroom, she fought back. Appellant attacked Henry a second time. He repeatedly hit her. Appellant brutally beat Henry's head, face, neck, and chest. Appellant dragged Henry across the room causing her head to strike the floor. He stomped on her head, neck, arm, and upper back with his shoe. Appellant's prolonged savagery resulted in Henry's death. She asphyxiated on the blood in her lungs and died from the blunt force trauma to her head and neck.

¶6 Appellant then took steps to conceal what he had done and flee to California. He put a sack around Henry's head and placed her body inside a shopping cart. Appellant covered Henry's body with boxes, pushed the cart out to Henry's car, and placed her body inside the back seat. Appellant gathered up peanut butter, sunflower seeds, a toothbrush, rubbing alcohol, and razors from the store's shelves and placed them in the car. He drove Henry's car to a semi-secluded area on his grandparent's land and removed her body from the car. Appellant completely undressed Henry from the waist down and pulled her jacket, tank-top, and sports bra up until they fully exposed her breasts. He dragged Henry's body to a muddy spot in the field and partially covered it with dirt and vegetation.

¶7 Appellant went inside his grandparent's home, put a clean shirt over the top of the shirt he was wearing, and collected additional items for his trip, including boots, clothing, hydrogen peroxide, and his wallet. Recognizing that it was too early for Appellant to be home from work, his grandfather, Stanley Bench, asked Appellant if he had quit or been fired. Appellant simply responded, "Yes." Appellant informed Mr. Bench that he was leaving. He went outside and washed himself in the water spigot. When he was done, he stuck his head back inside the door and declared; "Pa, I love you." Mr. Bench responded; "I do you too. Be careful out there and don't get hurt." Appellant stated, "Okay," and left.

¶8 Tammy Wilkerson ventured into the Teepee Totem around 8:15 that evening. She was alarmed to discover that the clerk was missing from the store. When she looked into the storeroom she discovered a pool of blood. Wilkerson called the Velma Police Department and contacted, Melissa Lynn, one of the other store clerks who lived nearby.

¶9 When Henry failed to return on time, her mother went looking for her. She contacted law enforcement when she was unable to find Henry.

¶10 The Stephen's County Sheriff's Department investigated Appellant's absence from the store. Deputy Michael Moore documented the interior of the convenience store and obtained a DNA sample from the pool of blood in the storeroom. Deputy David Martin went to the home of Appellant's grandparents to check on Appellant's welfare. Using canine officers, Lieutenant Chad Powell discovered Henry's nude body in the nearby field. The officers put out a "BOLO" alert for Henry's car.

¶11 Deputy Quinton Short of the Custer County Sheriff's Department received the alert and observed Henry's vehicle headed west on Interstate 40. He stopped the car and approached it on foot. Short observed in plain sight a large amount of blood in the backseat. He discovered Appellant seated in the driver's seat and ordered him to exit the car. Once outside the sedan, Appellant spontaneously declared that he was not driving the vehicle. Slightly confounded by Appellant's assertion, Short responded; "Then whose vehicle is it?" Appellant then stated; "I think I f****d up, I may have killed somebody." Deputy Short observed that Appellant had blood on his clothing. He took Appellant into custody and transported him to the Custer County Jail.

¶12 Chief Investigator Robert Short of the Custer County Sheriff's Department observed that Appellant had dirt on his face as well as on the shoulder of his shirt. He further noticed that Appellant had blood on his shirt, shoes, and socks. There was a mixture of blood and dirt on the bottom of Appellant's shoes. Short further observed that Appellant's hands were red and swollen.

¶13 Detention Officer, Kendall Brown, booked Appellant into the Custer County Jail. While Brown was gathering Appellant's information, Appellant interjected several admissions. Appellant informed Brown; "I think I might have messed up. I think I may have killed somebody." Later, Appellant mentioned; "I might have blacked out." Appellant asked Brown if he would be able to make bond. After Brown advised Appellant that he did not know, Appellant spontaneously stated; "I think I murdered someone. The officer in the car mentioned manslaughter *** isn't manslaughter murder?" Still later, Appellant volunteered; "I think Stephens County is gonna come get me."

¶14 Appellant repeatedly engaged Brown in small talk. Some of his statements evinced prior knowledge concerning the mental health system. Appellant volunteered that he had undergone "psych evaluations" while in the military and added that the "dude in the straight-jacket" is usually the one screaming that he is "not crazy."

¶15 Appellant attempted to develop grounds for an insanity plea from his conversation with Brown; Appellant asked where he was at? After Brown indicated that he was in Arapaho in Custer County, Appellant stated; "If they believe that I don't know where I am at they might believe that I was crazy." Thereafter, Appellant queried: "Since I blacked out do you think that I should go for an insanity plea or what?" Brown informed Appellant that he could not give him any legal advice whatsoever.

¶16 Investigator Justin Scott of the Stephens County District Attorney's Office executed a search warrant on Appellant's person. Appellant also spontaneously volunteered a statement to Scott. Appellant asked if Oklahoma had the death penalty. When Scott answered that under certain circumstances they do, Appellant declared that he needed death or needed to be locked away in the big house. Scott noticed that Appellant had a bite mark on his elbow.

¶17 Forensic testing revealed that Henry's DNA profile matched the DNA profile of the blood discovered in the storeroom. Similarly, Henry's profile matched the DNA profile of the blood found on Appellant's shoes.

ISSUES RELATING TO JURY SELECTION AND COMPOSITION

¶18 In Proposition I Appellant contends that the trial court erred when it denied his pretrial request for a change of venue. He argues that this action denied him his right to an impartial jury and a fundamentally fair trial.

¶19 The Sixth Amendment right to a jury trial "'guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent jurors'" and it is a basic requirement of due process that an accused receive a fair trial in a fair tribunal. DeRosa v. State, 2004 OK CR 19, ¶ 17, 89 P.3d 1124, 1133 (quoting Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)). Likewise, Article II, Section 20 of the Oklahoma Constitution and 22 O.S.2011, § 561 guarantee a criminal defendant a fair trial by an impartial jury.

¶20 We note that Henry's murder occurred in the small, rural farming community known as Velma. The town is approximately 18 miles southeast of Duncan, the county seat of Stephens County and where the trial took place.

¶21 Appellant timely filed an application for change of venue prior to trial. He cited to the titles of approximately 125 news articles appearing in either print, television or online. However, he did not include the content of the actual articles. It appears that not all of the cited articles actually referenced the instant case.[2] We also note that many of the cited news sources were not from the local community in which the crime occurred but were from sources throughout the state and across the globe as a whole.[3] Several of the cited titles appear to be from news aggregator websites.[4] Other articles belonged to online groups requiring admission to the group prior to accessing the cited blog.[5] Thus, many of the cited articles would not necessarily have been readily available in the local community. After the trial court denied his application, Appellant filed a motion to reconsider and attached the contents of 9 of the cited articles. The district court denied Appellant's renewed request.

¶22 The trial court conducted individual voir dire of the venire concerning the death penalty, prior knowledge concerning the offense and pretrial publicity. Appellant did not renew his pretrial request for a change of venue at any point during voir dire. As such, we find that he has waived appellate review of this issue for all but plain error. See Hain v. State, 1996 OK CR 26, ¶¶ 6-7, 919 P.2d 1130, 1136. We review Appellant's claim pursuant to the test for plain error set forth in Simpson v. State, 1994 OK CR 40, 876 P.2d 690. Stewart v. State, 2016 OK CR 9, ¶ 12, 372 P.3d 508, 511. Under this test, an appellant must show an actual error, which is plain or obvious, and which affects his substantial rights. Id. This Court will only correct plain error if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings or otherwise represents a miscarriage of justice. Id. 

¶23 Reviewing Appellant's claim in the present case for plain error, we find that he is not entitled to relief. "Our analysis begins with the rebuttable presumption that the accused can receive a fair trial in the county in which the offense occurred..." Hain, 1996 OK CR 26, ¶ 7, 919 P.2d at 1135. It is Appellant's burden to show he has been "so prejudiced by pretrial publicity that he did not receive a fair trial." Childress v. State, 2000 OK CR 10, ¶ 34, 1 P.3d 1006, 1014.

¶24 This Court has adopted the two-part test which the United States Supreme Court set forth in Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). DeRosa, 2004 OK CR 19, ¶ 20, 89 P.3d at 1135; Braun v. State, 1995 OK CR 42, ¶ 30, 909 P.2d 783, 792. First, there are rare instances in which prejudice is presumed. If the fact pattern reveals "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings" prejudice is presumed regardless of the assurances of individual jurors that they can be fair and impartial. Murphy, 421 U.S. at 799, 95 S.Ct. at 2035. The Supreme Court in Murphy identified four cases as exemplifying the circumstances where prejudice is presumed.

In Irvin v. Dowd the rural community in which the trial was held had been subjected to a barrage of inflammatory publicity immediately prior to trial, including information on the defendant's prior convictions, his confession to 24 burglaries and six murders including the one for which he was tried, and his unaccepted offer to plead guilty in order to avoid the death sentence. As a result, eight of the 12 jurors had formed an opinion that the defendant was guilty before the trial began; some went 'so far as to say that it would take evidence to overcome their belief' in his guilt.

Murphy, 421 U.S. at 798, 95 S.Ct. at 2035, (citing Irvin v. Dowd, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961)). In Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), a television station, in the community where the crime occurred and the trial took place, broadcast on three occasions a 20 minute film of the defendant's confession. Murphy, 421 U.S. at 799, 95 S.Ct. at 2035-36. The trial in Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), was conducted in a circus atmosphere which included the press sitting within the bar of the court and overrunning the proceedings with television equipment. Murphy, 421 U.S. at 799, 95 S.Ct. at 2036. Similarly, the conviction in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), "arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival." Murphy, 421 U.S. at 799, 95 S.Ct. at 2036. Prejudice was presumed in each of these cases because the proceedings "were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." Id.

¶25 However, juror exposure to information about a defendant's prior convictions or news accounts of the crime with which the defendant is charged, standing alone, does not create a presumption of prejudice. Id. "Media coverage extends to most homicides, particularly capital cases." Braun, 1995 OK CR 42, ¶ 32, 909 P.2d at 793 (quotations and citation omitted). The mere fact that pretrial publicity is adverse to a criminal defendant is not enough to presume prejudice. Id. Thus, this Court only presumes prejudice where a conviction has been obtained "in a trial atmosphere that has been utterly corrupted by press coverage" or entirely lacking in "'the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob.'" Id., 1995 OK CR 42, ¶ 31, 909 P.2d at 792 (quoting Murphy, 421 U.S. at 799, 95 S.Ct. at 2036); DeRosa, 2004 OK CR 19, ¶ 19, 89 P.3d at 1135.

¶26 The second part of the Murphy test focuses on the situation where the facts are not sufficiently egregious to give rise to the presumption of prejudice. DeRosa, 2004 OK CR 19, ¶ 20, 89 P.3d at 1135. This is the much more common circumstance. Id. In this situation, a reviewing court must evaluate the "totality of the circumstances" in order to determine whether the defendant received a trial which was "fundamentally fair." Id., citing Murphy, 421 U.S. at 799, 95 S.Ct. at 2035-36.

¶27 Turning to the present case, we find that the cited news coverage neither pervaded the trial court proceedings nor utterly corrupted the trial atmosphere. There was not a barrage of inflammatory publicity immediately before Appellant's trial as outlined in Irwin, Rideau or Sheppard. Although there was considerable media coverage of the case, the cited articles appeared over the course of the thirty-two months that passed between the date of the offense and Appellant's trial. See Braun, 1995 OK CR 42, ¶ 32, 909 P.2d at 793 (finding fact that publicity occurred over four-year period somewhat dispositive). The substance of the articles which Appellant actually included within his motion to reconsider was neither invidious nor inflammatory in nature. See Beck v. Washington, 369 U.S. 541, 556, 82 S.Ct. 955, 963, 8 L.Ed.2d 98 (1962). Appellant's characterization of the articles is not supported by the record. The articles did not demonize Appellant, demand swift justice, or stoke the emotional climate.[6] Similarly, the articles did not opine or assert that certain testimony or evidence suggested Appellant's guilt or support for imposition of death sentence. Instead, the articles simply recited only basic facts about the case and its progression through the court system.[7] Nothing in the record suggests that the individuals summoned to serve as jurors were predisposed to convict. Accordingly, we refuse to presume prejudice in the present case.

¶28 Instead, we review the totality of the circumstances of the present case in order to determine whether Appellant received a trial which was fundamentally fair. This includes review of the voir dire statements of individual jurors, voir dire statistics, and the atmosphere within the community, as reflected in the news media. Braun, 1995 OK CR 42, ¶ 31, 909 P.2d at 793, citing Murphy, 421 U.S. at 800-08, 95 S.Ct. at 2036-40. "[T]his Court focuses not on the jurors who might have been impaneled, but on the jurors who actually were impaneled." DeRosa, 2004 OK CR 19, ¶ 21, 89 P.3d at 1135.

¶29 Reviewing the totality of the circumstances in the present case we find that Appellant was not denied a fundamentally fair trial. The voir dire record reflects a fair and impartial jury venire which was not predisposed to convict Appellant. The trial court ultimately called 101 individuals to fill the venire. The transcript of the proceedings reveals that 53 of the venire members, a little over 50%, had received information about the case through the media, co-workers, friends or family. Many of them had received limited information about the case. Some had only heard about the offense when it had first happened. Others had only caught the passing words of an acquaintance. The trial court excused 9 individuals for cause because they were unable to set aside what they knew about the offense and decide the case based upon the evidence presented in court.[8] Therefore, less than 10% of the venire members possessed a partiality which could not be laid aside.

¶30 Although the trial court took note that the case carried emotion in the close-knit town of Velma, where the offense occurred, this sentiment did not appear to carry over into the remainder of Stephens County. Many of the venire members who were ultimately excused due to partiality, lived, worked or had a similar connection to the town of Velma. However, the trial court was not required to go to great lengths to select jurors who appeared impartial from the other parts of Stephens County. See Murphy, 421 U.S. at 802--03, 95 S.Ct. at 2037 (finding length which trial court must go in order to select jurors who appear impartial is another factor relevant in evaluating atmosphere of community). The predominant reason that the trial court excused an individual from other parts of the county was due to their inability to consider all three punishment options. As discussed above, the news articles about the case were largely factual in nature. After individual questioning, defense counsel was not compelled to challenge the partiality of the venire. For these reasons, we conclude that the atmosphere within the community was not so inflammatory as to suggest that Appellant could not receive a fair trial.

¶31 Similarly, the voir dire statements of the individual jurors do not suggest a general partiality or an inflammatory atmosphere. Although they were individually questioned, none of the venire members excused for partiality either glorified Henry or expressed a strong sentiment against Appellant. Instead, the individuals simply expressed their inability to be impartial by stating or confirming that they could not set aside what they knew about the offense and decide the case based on the evidence presented at trial.

¶32 Focusing on the jurors who were actually impaneled, we find that Appellant received a fair trial by a panel of impartial, indifferent jurors. We note that "[q]ualified jurors need not ... be totally ignorant of the facts and issues involved." Murphy, 421 U.S at 799-800, 95 S.Ct. at 2036. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin, 366 U.S. at 723, 81 S.Ct. at 1643.

¶33 The record establishes that 4 of the impaneled jurors (A.R., C.C., M.H., and R.R.) had not received any information about the case. Although 8 of the impaneled jurors had received some information about the cases prior to being summoned, this exposure was minimal. Jurors D.B., R.G., and L.W. had not seen any media reports about the case but had heard about it from someone else. Jurors M.R. and S.G. had seen media reports about the case but were too preoccupied with other parts of their lives to pay much attention to it. Jurors G.W., R.M., and L.R. had simply heard about the offense when it first happened but did not know the details of the case.

¶34 Regardless of the level of pretrial exposure to the facts of the case, the record establishes that all of the impaneled jurors were both indifferent and impartial. The trial court asked and each and every member of the panel, including the three alternates, expressly affirmed that they could set aside any prior knowledge or opinions regarding the case and decide the case based upon the evidence presented at trial. All of the impaneled jurors indicated, in one form or another, that they could be impartial as to both guilt and punishment.

¶35 Appellant has not shown that any of the jurors who were actually impaneled were challengeable for cause. As no individual sat on the jury that could not set aside his or her impression or opinion and render a verdict based on the evidence presented in court, we find that Appellant was not denied a fundamentally fair trial. Proposition I is denied.

FIRST STAGE ISSUES

¶36 In Proposition II Appellant challenges the trial court's refusal to suppress his inculpatory statements to Custer County Detention Officer, Kendall Brown. He argues that the admission of the statements at trial violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution as well as corresponding provisions of the Oklahoma Constitution.

¶37 The record shows that Appellant made several inculpatory statements to Brown as he was being booked into the Custer County Jail. Appellant filed a pretrial motion seeking to suppress these statements. The trial court held a hearing pursuant to Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Appellant argued that his statements were involuntary because Brown had failed to advise him of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Finding that Appellant voluntarily made the statements without any interrogation, the trial court denied Appellant's motion. At trial, Brown testified to the admissions over Appellant's objection renewing his motion to suppress.

¶38 We review the trial court's denial of a motion to suppress for an abuse of discretion. Sanders v. State, 2015 OK CR 11, ¶ 17, 358 P.3d 280, 285. This is the same standard of review applied to the trial court's admission of evidence. Davis v. State, 2011 OK CR 29, ¶ 156, 268 P.3d 86, 125. An abuse of discretion has been defined as a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented or, stated otherwise, any unreasonable or arbitrary action taken without proper consideration of the facts and law pertaining to the matter at issue. Neloms v. State, 2012 OK CR 7, ¶ 35, 274 P.3d 161, 170.

¶39 The United States Supreme Court has recognized that the Due Process Clause of the Fourteenth Amendment is the cornerstone of the determination of the admissibility of an inculpatory statement. Miller v. Fenton, 474 U.S. 104, 109--10, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985). In Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961), the Supreme Court set forth the test for the admissibility of an inculpatory statement under the Due Process Clause:

The ultimate test remains that which has been the only clearly established test in Anglo--American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

The voluntariness of a confession is evaluated on the basis of the totality of all the surrounding circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

¶40 This Court has generally refused to interpret the provision against self-incrimination within Article II, § 21 of the Oklahoma Constitution broader than the United States Supreme Court's interpretation of similar federal provisions. Dennis v. State, 1999 OK CR 23, ¶ 20, 990 P.2d 277, 286-86; State v. Thomason, 1975 OK CR 148, ¶ 14, 538 P.2d 1080, 1086. Instead, in addressing confessions or inculpatory statements, this Court has interpreted both § 7 and § 21 of the Oklahoma Constitution consistent with the Supreme Court's overriding standard. Williams v. State, 1982 OK CR 107, ¶¶ 14-17, 648 P.2d 843, 845; Brown v. State, 1963 OK CR 67, ¶¶ 14, 22-27, 384 P.2d 54, 59-61; Marks v. State, 1951 OK CR 145, 237 P.2d 459, 461. The ultimate test for the admission of either an inculpatory statement or a confession is the test of "voluntariness." Johnson v. State, 2012 OK CR 5, ¶ 14, 272 P.3d 720, 727; Williams, 1982 OK CR 107, ¶ 17, 648 P.2d at 845; Brown, 1963 OK CR 67, ¶¶ 26-27, 384 P.2d at 61. A statement is voluntary, and thus admissible in evidence, only when all the surrounding circumstances indicate that the statement is the product of an essentially free and unconstrained choice by its maker. Id. (quotation and citation omitted).

¶41 As he did below, Appellant argues that his inculpatory statements were not voluntary because they were given during custodial interrogation and Brown did not advise him of his Miranda rights. In Miranda, the United States Supreme Court held that the prosecution could not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless the suspect receives, prior to police questioning, certain warnings including the right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed. Miranda, 384 U.S. at 444, 86 S.Ct. at 1612. "The term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689, 64 L. Ed. 2d 297 (1980). The special procedural safeguards set forth in Miranda are not required where a subject is simply taken into custody, but rather where a suspect in custody is subjected to either express questioning or its functional equivalent. Id., 446 U.S. at 300-01, 100 S.Ct. at 1689.

¶42 "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." Miranda, 384 U.S. at 478, 86 S.Ct. at 1630. In Romano v. State, 1995 OK CR 74, 909 P.2d 92, this Court recognized this circumstance stating that "[i]n post-arrest situations where Miranda warnings have not yet been given, a defendant's voluntary statements, not made in response to questioning, are admissible." Id., 1995 OK CR 74, ¶ 19, 909 P.2d at 109.

¶43 In Pennsylvania v. Muniz, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), a plurality of the Supreme Court recognized the "routine booking question" exception which exempts from Miranda's coverage, questions to secure the biographical data necessary to complete booking or pretrial services. Id. 496 U.S. at 601--02, 110 S.Ct. at 2650. (plurality of four justices) (quotations and citation omitted). In Clayton v. State, 1992 OK CR 60, ¶ 29, 840 P.2d 18, 27, this Court determined that the inquiries necessary for proper booking procedures do not amount to "interrogation" for the purposes of Miranda. See also Gilbert v. State, 1997 OK CR 71, ¶¶ 46-47, 951 P.2d 98, 112 ("find[ing] no error in admitting Appellant's responses to background information as no Miranda warnings were required.").

¶44 "The underlying rationale for the exception is that routine booking questions do not constitute interrogation because they do not normally elicit incriminating responses." United States v. Parra, 2 F.3d 1058, 1068 (10th Cir. 1993). Therefore, the police may not ask questions during booking that are designed to elicit incriminatory admissions, without first obtaining a waiver of the suspect's Miranda rights. Muniz, 496 U.S. at 602 n. 14, 110 S.Ct. at 2650 n. 14; Clayton, 1992 OK CR 60, ¶ 29, 840 P.2d at 27 (finding booking questions did not require Miranda warning because "questions certainly were not the kind which the detective should know were reasonably likely to elicit incriminating statements").

¶45 Turning to the present case, we find that the trial court did not abuse its discretion when it denied Appellant's motion to suppress and admitted the challenged statements at trial. It is patently clear that Appellant was in custody. However, the trial court's determination that Appellant voluntarily made the statements without any interrogation is not clearly against the logic and effect of the facts presented.

¶46 Appellant's statements to Brown were preceded by his spontaneous declaration to Deputy Quinton Short; "I think I f****d up, I may have killed somebody." Short took Appellant into custody and transported him to the Custer County Jail.

Detention Officer Brown contacted Appellant as soon as the arresting officers brought him into the jail and sat him in the back of the room. Brown started gathering Appellant's biographical information to get a head start on the booking process. This exchange was captured on the jail's recording system and introduced into evidence at the pretrial hearing. Brown asked Appellant the necessary questions to book him into the jail, including his name, date of birth, height, weight, eye color, place of birth, current address, marital status, telephone, medical issues, and current medications. Brown simply asked Appellant for the requisite information and did not make any small talk. When Brown asked if he had any allergies to any medications, Appellant said; "[I've] been losing my voice lately." Brown followed up and asked; "Sick or something with a cold or flu?" Appellant stated; "I got a problem. I know I did something wrong. I just blacked out." Brown remarked; "Dude, I don't have nothing to do with anything like that." Appellant replied; "I know." Then he stated, "It's bad."

¶47 After Appellant's admission, Brown returned to asking Appellant the computer generated booking questions, including his social security number, emergency contact, whether Appellant was addicted to any drugs or alcohol which would cause him to have withdrawal symptoms during his stay in the jail, and whether Appellant had any identifying tattoos. Appellant disclosed that he had a tattoo of "PX SPEC" on his left upper arm. Brown sought to clarify the nature of the tattoo. When he correctly recognized it as military, Appellant became very talkative.

¶48 Brown was unable to complete the booking process. Instead, he was forced to wait until the arresting officers released Appellant from the back of the room so he could bring him up to the front and go over the information entered into the computer. During the interim, Brown answered Appellant's many questions and generally chatted with Appellant about the military and guns.

¶49 Brown related at trial that he did not interrogate Appellant but simply engaged in small talk like he did with most arrestees to make them easier to deal with and make the booking process go smoother. After a time, both men fell silent. Without Brown making any statement or question, Appellant bluntly stated; "I think I may have killed somebody." Brown advised Appellant, "Dude, don't tell me," and fell silent again.

¶50 Since Appellant had made the previous admissions and Brown knew the jail's recording system did not always accurately capture entire conversations, Brown used his phone to record Appellant's statements. Appellant returned to asking Brown questions. He asked Brown if he was a jailer? He, then, asked if Brown had seen any interesting characters. Brown answered; "Interesting? No. Crazy? Yes." He related anecdotes about two colorful inmates that had been held in the jail. Appellant volunteered that the military required "psych evaluations" and added that the "dude in the straight-jacket" is usually the one screaming that he is "not crazy." He further stated; "we all have to be a little crazy to keep from going insane."

¶51 When the arresting officers returned, they checked on Brown's progress booking Appellant into the jail. They released Appellant from the back of the room so Brown could complete the process. After Brown moved him to the front of the room, Appellant freely chatted with Brown. When he asked; "Is there some detective or someone I can talk to?," Brown advised him; "I don't know." Appellant asked about the list of Bondsman on the wall and Brown explained how bonds worked. After Appellant asked if he could write down their numbers, Brown related that Appellant was only being temporarily held in his county.

¶52 Appellant queried where he was at and Brown informed him that he was in Arapaho in Custer County. Appellant then spontaneously declared; "If they believe that I don't know where I am at they might believe that I was crazy." Brown made no response to this statement. Appellant followed up by asking; "Do you think that I'll make bond at all?" Brown responded; "I have no idea, dude. I don't know if you have charges or are gonna have charges. I don't have a clue." Appellant then volunteered; "I think I murdered someone. The officer in the car mentioned manslaughter ... isn't manslaughter murder?" Brown advised Appellant that he was unable to tell him and explained that he was just a jailer, did not know anything about the law, and simply booked people into the jail.

¶53 Brown informed Appellant that "technically" he was not booking Appellant into the jail but was simply showing that he was there. When Appellant stated, "I think Stephens County is gonna come get me," Brown did not respond. Appellant then asked Brown; "Since I blacked out, do you think that I should go for an insanity plea or what?" Brown finally drove home his point by advising Appellant; "I can't give you any legal opinions whatsoever."

¶54 After a period of silence, Brown asked Appellant some additional medical questions and quickly confirmed the information that Appellant had previously given him. He had Appellant read over the jail rules and acknowledge his receipt of the same; execute a statement accounting for Appellant's property; and certify his answers to the medical questions. After completing the booking process, Brown gave Appellant a blanket and placed him in one of the cells in the jail.

¶55 Based upon the totality of the circumstances, we find that the trial court properly rejected Appellant's motion to suppress. The record plainly supports the trial court's determination that Appellant voluntarily made the statements without any interrogation. Brown's questions to Appellant fell squarely within the "routine booking question" exception. The questions which Brown asked Appellant were clearly not designed to elicit incriminatory admissions. Thus, Appellant was not subject to interrogation.

¶56 Instead, Appellant's statements were the product of an essentially free and unconstrained choice on his part. The record shows that Appellant was predisposed to confess and explain away his offense. Appellant's admissions were volunteered. The great majority of his statements were made when Brown paused his book-in questions or was simply silent. Appellant's inculpatory statements did not directly respond to any of Brown's questions.

¶57 Appellant argues that his statements should have been suppressed because Brown went outside the scope of the ordinary booking questions. We are not persuaded by this argument. Although Brown engaged in small talk with Appellant, his questions were certainly not the kind which an officer should know were reasonably likely to elicit incriminating statements. As such, we conclude that Appellant was not subjected to custodial interrogation or its functional equivalent.

¶58 The trial court's determination that Appellant volunteered the statements is not clearly against the weight and effect of the facts presented. Accordingly, we find that the trial court did not abuse its discretion when it admitted Appellant's admissions at trial. Proposition II is denied.

¶59 In Proposition III, Appellant challenges the trial court's admission of State's Exhibit Numbers 501 through 523. He argues that these photographs were gruesome, lacked probative value and were unfairly prejudicial. The admissibility of photographic evidence, as with all evidence, is reviewed under an abuse of discretion standard. Glossip v. State, 2007 OK CR 12, ¶ 80, 157 P.3d 143, 157. Unless a clear abuse of discretion is shown, reversal will not be warranted. Horn v. State, 2009 OK CR 7, ¶ 41, 204 P.3d 777, 787.

¶60 The trial court examined all of the State's proffered photographs during a pretrial hearing on Appellant's motion and, again, at trial. The trial court individually assessed each of the photographs and excluded any which were cumulative. After hearing the testimony of the State's witnesses, the trial court determined that the photos corroborated the medical examiner's testimony, showed the nature, extent, number and nature of Henry's injuries, were not unduly prejudicial and admitted the exhibits.

¶61 "The issue of gruesome photographs has been discussed by this Court in case after case, and the issues relating thereto are well known." Cole v. State, 2007 OK CR 27, ¶ 29, 164 P.3d 1089, 1096. "'Gruesome crimes result in gruesome pictures.'" Id., quoting Patton v. State, 1998 OK CR 66, ¶ 60, 973 P.2d 270, 290. Photographs are admissible if their content is relevant and their probative value is not substantially outweighed by their prejudicial effect. Davis, 2011 OK CR 29, ¶ 86, 268 P.3d at 113; Bernay v. State, 1999 OK CR 37, ¶ 18, 989 P.2d 998, 1007. Relevant evidence is defined as evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. 12 O.S.2011, § 2401. "The probative value of photographs of murder victims can be manifested in numerous ways, including showing the nature, extent and location of wounds, establishing the corpus delicti, depicting the crime scene, and corroborating the medical examiner's testimony." Davis, 2011 OK CR 29, ¶ 86, 268 P.3d at 113.

¶62 "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise." 12 O.S.2011, § 2403. Where there is duplication in images, the appellant has the burden to show that the repetition in images was needless or inflammatory. Mitchell v. State, 2010 OK CR 14, ¶ 63, 235 P.3d 640, 656. "When measuring the relevancy of evidence against its prejudicial effect, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." Id., 2010 OK CR 14, ¶ 71, 235 P.3d at 657; Mayes v. State, 1994 OK CR 44, ¶ 77, 887 P.2d 1288, 1310.

¶63 Reviewing the record, we find that the trial court did not abuse its discretion when it admitted the challenged photographs. The photographs admitted as State's Exhibit Numbers 501 through 518 depicted Henry's injuries. State's Exhibit Humber 501 showed Henry's face, head, and shoulders. The remaining photographs were close up images of the abrasions, contusions and trauma which Henry suffered. The photographs do not depict the work of the medical examiner but solely display Henry's injuries.

¶64 The challenged exhibits held great probative value. The photographs accurately depicted the nature, extent and location of Henry's wounds, established the corpus delicti, and corroborated the medical examiner's testimony. They were neither extensive nor cumulative. Each photograph depicted a different aspect or injury on Henry's body. The medical examiner, Dr. Inas Yacoub, extensively relied upon the exhibits to illustrate to the jury the blunt force trauma to which Henry had been subjected and explain how that ultimately caused her death. As such, we find that the probative value of Exhibit Numbers 501 through 518 was not substantially outweighed by their prejudicial effect.

¶65 The photographs admitted as State's Exhibit Numbers 519 through 523 depicted the blood-soaked clothing which Henry had worn that night. Appellant's claim that this evidence was gruesome is not well taken. As with the other challenged exhibits, the photographs of Henry's clothing held great probative value. The exhibits were probative of the nature, extent and location of Henry's wounds and corroborated the testimony of the State's witnesses. The blood-soaked nature of the clothing tended to establish the force and violence to which Henry was subjected and corroborated the medical examiner's determination that her death was caused by blunt force trauma. Thus, we find that the probative value of Exhibit Numbers 519 through 523 was not substantially outweighed by their prejudicial effect.

¶66 Appellant argues that the photos were not necessary to prove the State's case. He asserts that Dr. Yacoub's testimony and the diagrams in her report adequately covered Henry's wounds and the cause of death. This Court has repeatedly rejected the argument that photographs are not relevant if the cause of death is not contested. Smallwood v. State, 1995 OK CR 60, ¶ 33, 907 P.2d 217, 228; Hooks v. State, 1993 OK CR 41, ¶ 26, 862 P.2d 1273, 1281. The State is charged with establishing the elements of the offense and is entitled to corroborate and illustrate the testimony of its witnesses about what the crime scene looked like and the manner of death. Davis, 2011 OK CR 29, ¶ 89, 268 P.3d at 113. The State is not required to downplay the visual effects of a particular crime. Id. A medical examiner's diagrams and testimony concerning the location, nature, and extent of injuries are necessarily limited in their ability to convey to the jury the actual appearance of the victim's injuries. DeRosa, 2004 OK CR 19, ¶ 72, 89 P.3d at 1150.

¶67 Appellant also argues that the photographs obfuscated the evidence of his mental illness. We are not persuaded by this argument. Although the photographs show the results of the brutal crime, the photographs do not remotely approach those that this Court has previously determined as extremely grotesque. See Cole, 2007 OK CR 27, ¶ 30, 164 P.3d at 1096 (finding photographs depicting helpless child after grown man broke him in half "extremely grotesque, the sort of pictures that we would all like to avoid in our lives."). Because the photographs accurately depicted the nature, extent and location of Henry's wounds, established the corpus delicti, evidenced the force and violence to which Henry was subjected and corroborated the medical examiner's testimony, we find that their probative value was not substantially outweighed by their prejudicial effect. The photographic evidence was neither extensive nor cumulative. Therefore, we conclude that the trial court did not abuse its discretion in the admission of the challenged photographs. Proposition III is denied.

¶68 In Proposition V, Appellant contends the trial court erred in refusing to give his requested instructions on the lesser included offense of second degree depraved mind murder. He further asserts that by failing to instruct the jury on any lesser forms of homicide, the trial court violated his federal due process rights under Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). "The determination of which instructions shall be given to the jury is a matter within the discretion of the trial court." Eizember v. State, 2007 OK CR 29, ¶ 111, 164 P.3d 208, 236. "Absent an abuse of that discretion, this Court will not interfere with the trial court's judgment if the instructions as a whole, accurately state the applicable law." Id.

¶69 In denying Appellant's requested lesser offense instruction, the trial court determined that there was not any evidence to support an instruction upon second degree depraved mind murder. Reviewing the record we find that Appellant has not shown that the trial court's conclusion was clearly against the logic and effect of the facts presented. Neloms, 2012 OK CR 7, ¶ 35, 274 P.3d at 170.

¶70 In Beck, the United States Supreme Court held that a sentence of death may not constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict. Beck, 447 U.S. at 637, 100 S.Ct. at 2389. However, Beck does not require that the jury in a capital case be given a non-capital option where the evidence absolutely does not support that option. Davis, 2011 OK CR 29, ¶ 122, 268 P.3d at 120, citing Spaziano v. Florida, 468 U.S. 447, 455--56, 104 S.Ct. 3154, 3159--3160, 82 L.Ed.2d 340 (1984).

¶71 A Beck claim has two components. Davis, 2011 OK CR 29, ¶ 120, 268 P.3d at 120. First, the appellant must establish that the crime on which the trial court refused to instruct was actually a lesser-included offense of the capital crime of which he was convicted. Id. Second, the appellant must show that the evidence presented at trial would permit a rational jury to find him guilty of the lesser included offense and acquit him of first degree murder. Id.

¶72 We must turn to State law to resolve Appellant's Beck claim. This Court had traditionally looked to the statutory elements of the charged crime and any lesser degree of crime to determine the existence of any lesser included offenses. State v. Tubby, 2016 OK CR 17, ¶¶ 5-6, 387 P.3d 918, 920. "However, in Shrum v. State, 1999 OK CR 41, 991 P.2d 1032, 1035, a majority of this Court determined the 'strict statutory elements approach' was too narrow and inflexible and broadened the rule to include situations 'where the lesser and greater offense are in the same class of offenses and are closely or inherently related, but the elements do not satisfy the strict statutory elements test.'" Id., 2016 OK CR 17, ¶ 7, 387 P.3d at 921, quoting Shrum, 1999 OK CR 41, ¶¶ 7--9, 991 P.2d at 1036.

¶73 Prima facie evidence of the lesser offense must be presented at trial in order to warrant giving the lesser included instruction. Davis, 2011 OK CR 29, ¶ 101, 268 P.3d at 116. Prima facie evidence of a lesser included offense is that evidence which would allow a jury rationally to find the accused guilty of the lesser offense and acquit him of the greater. Id.; see also Simpson v. State, 2010 OK CR 6, ¶ 17, 230 P.3d 888, 897 (a lesser offense instruction should not be given unless the evidence would support a conviction for the lesser offense).

¶74 As Second Degree Murder has historically been recognized as a lesser included offense of First Degree Murder, we conclude that the requested lesser offense was, in fact, a necessarily included offense of the charged crime.[9] Therefore, Appellant was entitled to an instruction upon second degree depraved mind murder if prima facie evidence of the offense was presented at trial.

¶75 "Murder in the second degree occurs '[w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.'" Williams v. State, 2001 OK CR 9, ¶ 23, 22 P.3d 702, 712, (quoting 21 O.S.1991, § 701.8(1)). The elements of second degree depraved mind murder are: First, the death of a human, Second, caused by conduct which was imminently dangerous to another person, Third, the conduct was that of the defendant's, Fourth, the conduct evinced a depraved mind in extreme disregard of human life, Fifth, the conduct is not done with the intention of taking the life of any particular individual. Inst. No. 4-91, OUJI-CR(2d) (Supp.2000). "[A] person evinces a 'depraved mind' when he engages in imminently dangerous conduct with contemptuous and reckless disregard of, and in total indifference to, the life and safety of another." Id.

¶76 Examples of this crime include: (1) shooting into a crowd, where one does not intend to kill any particular person, but where the likelihood of death is probable; (2) steering a speeding vehicle into the oncoming path of another speeding vehicle; (3) throwing a heavy stone into a crowded street; and (3) aiming a gun at the victim's ankles intending to simply injure the victim but, because of poor marksmanship, shooting the victim in the back and killing him. Id.; Smallwood, 1995 OK CR 60, ¶ 48, 907 P.2d at 231; Smith v. State, 1984 OK CR 15, ¶ 5 n. 1, 674 P.2d 569, 571 n.1, 365; Dennis v. State, 1977 OK CR 83, ¶ 24, 561 P.2d 88, 95; Gibson v. State, 1970 OK CR 171, ¶ 10, 476 P.2d 362, 365. An accidental killing will not support a finding that the killer had a depraved mind. Harris v. State, 2004 OK CR 1, ¶ 50, 84 P.3d 731, 750; Crumley v. State, 1991 OK CR 72, ¶ 13, 815 P.2d 676, 678--79.

¶77 Reviewing the record, we find that the evidence was insufficient to permit a rational jury to find Appellant guilty of second degree depraved mind murder. There was not any evidence to support an instruction upon second degree depraved mind murder. Neither the State nor Appellant presented evidence evincing that Appellant engaged in conduct akin to shooting into a crowd, i.e. imminently dangerous conduct done without the intention of taking the life of any particular individual. Thus, no reasonable view of the evidence gives rise to the inference that Appellant's conduct evinced a depraved mind in extreme disregard of human life.

¶78 Similarly, there was not any evidence showing that Appellant acted without the intention of taking the life of any particular individual. Appellant's sole defense at trial was that he was legally insane at the time of the offense. During opening argument, defense counsel admitted that Appellant had taken Henry's life and asserted that Appellant's actions did not make any sense because Appellant was insane. Appellant offered the testimony of forensic psychologist, Curtis Grundy, Ph.D., to support this defense. Grundy testified as to Appellant's mental health and sanity but did not render any opinion about Appellant's ability to form the intent to kill at the time of the offense.

¶79 During Dr. Grundy's evaluation, Appellant made several statements concerning Henry's murder. Dr. Grundy related these statements to the jury. The trial court determined that Appellant's statements concerning the offense evinced that he had intentionally taken Henry's life. As the trial court's conclusion is not clearly against the weight and effect of the facts presented, we are bound to accept this interpretation of the evidence. Appellant admitted that he had intentionally taken Henry's life but sought to excuse that act under the notion that he acted under an insane delusion that he killed somebody who he believed had intended to kill him. In light of Appellant's and defense counsel's admissions, we find that no rational jury could conclude that Appellant acted without the intention of taking Henry's life.

¶80 In the absence of any evidence showing both that Appellant's conduct evinced a depraved mind in extreme disregard of human life and that he acted without the intention of taking the life of any particular individual, we must conclude that the evidence would not have permitted a rational jury to find Appellant guilty of second degree depraved mind murder. Therefore, we find that the trial court properly refused Appellant's request for an instruction upon this lesser included offense.

¶81 At the same time, we conclude that the evidence would not have permitted a rational jury to acquit Appellant of the charged offense of first degree murder. Deputy Quinton Short testified that Appellant informed him; "I think that I F****d up. I may have killed somebody." Detention Officer Kendall Brown testified that when he later encountered Appellant in the jail, Appellant advised him; "I got a problem. I know I did something wrong . . . I think I may have killed somebody." The medical examiner's testimony established that Appellant subjected Henry to a prolonged, brutal, and relentless attack. Dr. Inas Yacoub testified that Henry had extensive blunt force trauma to her head, face, scalp, neck and upper torso which resulted in internal bleeding. She also had bruises on her legs, arms, and hands. Sufficient pressure had been applied to Henry's neck to cause the fracture of the cricoid cartilage, petechiae in both eyes, and bleeding in the lining of her airways. Yacoub explained that the numerous injuries could not be explained by a single impact. Henry also had pattern injuries on her head, neck, arm, and upper back which were consistent with the bottom of Appellant's shoes. The photographs of Henry's injuries and the clothing that she wore on the night of her death thoroughly corroborated Dr. Yacoub's explanation. As no reasonable view of the evidence would permit a rational jury to acquit Appellant of first degree murder, we find that the trial court did not abuse its discretion when it refused Appellant's request for an instruction upon second degree depraved mind murder.

¶82 Since Appellant has not shown that the evidence presented at trial would permit a rational jury to find him guilty of second degree depraved mind murder and acquit him of first degree murder we find the trial court did not violate Appellant's federal due process rights under Beck. Proposition V is denied.

¶83 In Proposition VI, Appellant contends that Dr. Terese Hall rendered improper expert opinion testimony. He argues that Hall improperly vouched for the credibility of the State's witnesses while dismissing the credibility of key defense witnesses.

¶84 Appellant concedes that he waived appellate review of this issue when he failed to object to Hall's testimony at the time of trial. Therefore, we review Appellant's claim pursuant to the test set forth in Simpson v. State, 1994 OK CR 40, 876 P.2d 690, and determine whether Appellant has shown an actual error, which is plain or obvious, and which affects his substantial rights. Tollett v. State, 2016 OK CR 15, ¶ 4, 387 P.3d 915, 916. This Court will only correct plain error if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings or otherwise represents a miscarriage of justice. Id.

¶85 Applying this analysis to the present case, we find that Appellant has not shown the existence of an actual error that is plain or obvious. Appellant presented the testimony of forensic psychologist, Curtis Grundy, Ph.D., and the State presented the testimony of forensic psychologist, Terese Hall, Ph.D., in rebuttal. Both Dr. Grundy and Dr. Hall testified that in forming their respective opinions they relied upon information from people who had interacted with Appellant both before and after Henry's murder, including Appellant's immediate family members and members of law enforcement. Both also testified that they compared and contrasted the individuals' numerous statements in arriving at their final opinion.

¶86 Appellant lived with his grandparents at the time of the offense. Both Dr. Grundy and Dr. Hall related that they had received two different sets of information from Appellant's grandparents. Their accounts had changed over time. Appellant's grandfather, Stanley Bench, testified at preliminary hearing approximately five months after the offense. Mr. Bench advised that there was nothing wrong with Appellant. When he met with Dr. Grundy approximately two years after the offense, Mr. Bench gave a different account. Mr. Bench indicated that a month prior to the offense, Appellant began mumbling to himself; he had trouble sleeping and stayed up all night; he banged on his bedroom wall and spoke in two different voices; and he stopped showering and grooming himself. Mr. Bench further indicated that Appellant advised that he had an implant in his brain like the Manchurian Candidate; a man and a woman from the Navy were after him; they had come into the store trying to kill him; and he was going to have to do something about them if they didn't stop.

¶87 Appellant's grandmother, Albertha Bench, initially indicated that Appellant lived in a world of make believe; he thought that he had seen spirits; was sometimes depressed and moody; did not like authority; was easily angered; and believed that he was smarter than everyone else. A few of Mrs. Bench's statements indicated that Appellant may have had some paranoia. She related that Appellant had advised her that he thought someone was after him and he came into her room one night because he thought something was in his room. At preliminary hearing, Mrs. Bench simply described Appellant as "a little mental." When Dr. Grundy evaluated Appellant two years after the offense, Mrs. Bench's relation of mental health concerns about Appellant had substantially grown. Despite the fact that she worked the graveyard shift and did not regularly see Appellant, Mrs. Bench related that Appellant was irrational; went without sleep for 4 or 5 days at a time; hit her bedroom wall at night; did not shower or groom himself; claimed that he was Jason Bourne or a spy; claimed that he had a chip in his head like the Manchurian Candidate; and repeatedly came into her room at night claiming that he was scared. Mrs. Bench indicated Appellant stated that he saw heads coming out of the closet after him, the apparition of a little girl in a white dress, and a man and a woman on these occasions. He further advised her that a man and a woman wanted to kill him, they had a hit out on him, and they had come into the convenience store, again.

¶88 Dr. Grundy testified that he heavily relied upon the statements of Mr. and Mrs. Bench in reaching the conclusion that Appellant had schizophrenia, suffered a psychotic break with delusions and was legally insane at the time of the offense. Testifying in rebuttal, Dr. Hall related that although Appellant had some psychological problems she did not see any signs of severe psychosis in him. She did not believe that he was sufficiently impaired at the time of the crime to render him unable to know right from wrong. Explaining why she reached a different conclusion than Dr. Grundy, she noted the inconsistencies in the grandparent's statements over time. Dr. Hall testified that she "discounted" the later statements because she felt that the statements both given under oath and closer in time to the offense were more reliable.

¶89 Appellant challenges Hall's statement about her discounting as improper vouching. The Oklahoma Evidence Code places few restrictions on the information an expert may rely upon to form her opinions. Lewis v. State, 1998 OK CR 24, ¶ 19, 970 P.2d 1158, 1166. The facts or data need only be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. Id.; 12 O.S.Supp.2013, § 2703. Pursuant to 12 O.S.2011, § 2705, an expert may testify in terms of opinion or inference and give her reasons therefor with or without prior disclosure of the underlying facts or data. Id.[10]

¶90 However, this Court has determined that an expert witness cannot vouch for the truthfulness or credibility of a witness. Warner v. State, 2006 OK CR 40, ¶ 24, 144 P.3d 838, 860-61, overruled on other grounds by Taylor v. State, 2018 OK CR 6, 767 P.3d 265. "Vouching" occurs when an attorney or witness indicates a personal belief in a witness's credibility, either through explicit personal assurances of the witness's veracity or by implicitly indicating that information not presented to the jury supports the witness's testimony. Nickell v. State, 1994 OK CR 73, ¶ 7, 885 P.2d 670, 673. Thus, an expert is not permitted to testify as to whether a witness was either lying or telling the truth. Lawrence v. State, 1990 OK CR 56, ¶ 4, 796 P.2d 1176, 1177.

¶91 We find that Hall's explanation did not constitute improper opinion on the credibility of a witness. Hall did not indicate a personal belief as to whether Mr. and Mrs. Bench were either lying or telling the truth. Instead, she simply explained why she relied upon certain facts more than other facts. We note that the challenged statement was part of Hall's explanation for why she reached a different opinion than Dr. Grundy. It is clear from the record that forensic psychologists reasonably rely upon such assessments in forming their opinions. Thus, Hall properly disclosed the discounting as part of the facts underlying her opinion that were different from Dr. Grundy's assessment.

¶92 Appellant also challenges Hall's statement that she took Mr. and Mrs. Bench's later statements with a grain of salt. Not satisfied with Hall's explanation that she had discounted the later statements, the prosecutor pushed Hall into testimony that nearly crossed the line of propriety. The prosecutor clarified that Hall had heard Dr. Grundy's discussion of individuals' "motivations [ ] to fabricate or elaborate or lie" and then obtained Hall's admission, "Yes" that she had taken the Benches' "later statements with a grain of salt" "because of that." This exchange very nearly placed Hall in the position of rendering an opinion as to whether the Benches were lying or telling the truth. As Hall did not testify as to what motivation she believed the Benches held, we find that Appellant has not shown an actual error that was plain or obvious.

¶93 Appellant further asserts that Hall vouched for the testimony of Clayton Jenson when she stated that he was worthy of belief because he was consistent in his statements to both law enforcement and to her. Appellant's claim is not supported by the record. Hall never remarked that Jenson was worthy of belief. When Hall initially disclosed that she had received two different sets of information from Appellant's family she mentioned that she would discuss Jenson separately because he "was the same throughout." Later, she related what Jenson had told her. Hall did not render any opinion as to whether Jenson was lying or telling the truth. She did not indicate a personal belief in Jenson's testimony at trial. As such, we conclude that Appellant has not shown the existence of an actual error in Hall's testimony about Jenson's statements.

¶94 Appellant also argues that Hall contended that jail administrator Dallas Cowen was trustworthy. Again, this assertion is not supported by the record. Hall did not testify that Cowen was trustworthy. The record shows that the prosecutor continued to explore why Hall's opinion differed from Dr. Grundy's opinion. Hall affirmed that she had information from Cowen as to how Appellant acted differently when a doctor or attorney visited him which Dr. Grundy did not have. She also affirmed that she thought it would have been important for Dr. Grundy to have had this information. Hall did not render any opinion as to whether Cowen lied or told the truth. She did not indicate a personal belief in Cowen's statement. As such, we conclude that Appellant has not shown the existence of an actual error.

¶95 Finally, Appellant claims that Hall impermissibly stated her belief that Appellant's family was not credible and implied that Dr. Grundy's reliance on the family was misplaced. We are not persuaded by this argument. Hall testified: "[I] think Dr. Grundy considered the family information that was offered later on to be highly credible and I did not. I think that is the main difference." Again, this was part of Hall's explanation as to why she reached a different conclusion than Grundy. Hall did not render any opinion as to whether the Benches were lying or telling the truth. She did not tell the jury who to believe. As such, we find that Appellant has not shown the existence of an actual error.

¶96 In the heading of this proposition of error, Appellant outlines that Hall's testimony rendered his trial fundamentally unfair in violation of the Fourteenth Amendment to the United States Constitution. As Appellant has not provided any argument or authority supporting this claim, we find that he has forfeited appellate review of the issue. Rule 3.5(C)(6), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2017) ("Failure to present relevant authority in compliance with these requirements will result in the issue being forfeited on appeal."); Malone v. State, 2013 OK CR 1, ¶ 59, 293 P.3d 198, 215 (finding claim lacking argument or authority waived); Harmon v. State, 2011 OK CR 6, ¶ 90, 248 P.3d 918, 946 (finding claim waived where no argument or authority presented). Proposition VI is denied.

SECOND STAGE ISSUES

¶97 In Proposition IX, Appellant challenges the sufficiency of the evidence supporting the continuing threat aggravating circumstance. When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, this Court reviews the evidence in the light most favorable to the State to determine if any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt. Grissom v. State, 2011 OK CR 3, ¶ 61, 253 P.3d 969, 990.

¶98 To prove the continuing threat aggravator, the State must present evidence showing the defendant's behavior has demonstrated a threat to society and a probability that this threat would continue to exist in the future. Bush v. State, 2012 OK CR 9, ¶ 42, 280 P.3d 337, 347. Evidence evincing that the murder was callous can be considered as supporting the existence of a continuing threat. Grissom, 2011 OK CR 3, ¶ 61, 253 P.3d at 990. Attempts to escape are among the other factors that, coupled with the calloused nature of the crime, may also support a finding that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Bush, 2012 OK CR 9, ¶¶ 43-49, 280 P.3d at 347-48. A criminal history exhibiting a pattern of escalating violence is also viewed as supporting a determination that a defendant would constitute a continuing threat. Davis, 2011 OK CR 29, ¶ 139, 268 P.3d at 122; Rojem v. State, 2006 OK CR 7, ¶ 65, 130 P.3d 287, 300.

¶99 Appellant argues that none of the evidence which the State elicited in support of this aggravating circumstance indicates that he is likely to commit future acts of violence. He asserts that the incidents the State used to support this aggravating circumstance were non-violent. The State need not identify any particular violent act that the defendant committed prior to the crime. Bush, 2012 OK CR 9, ¶ 44, 280 P.3d at 347. "To prove this aggravating circumstance, this Court has held the State may present any relevant evidence, in conformance with the rules of evidence, including evidence from the crime itself, evidence of other crimes, admissions by the defendant of unadjudicated offenses or any other relevant evidence." Bland v. State, 2000 OK CR 11, ¶ 135, 4 P.3d 702, 735 (quotations and citation omitted). Evidence that the defendant has committed other crimes which were non-violent may satisfy the State's burden of proof if, coupled with the other evidence at trial, the prior offenses indicate a likelihood of future violence. Jones v. State, 2006 OK CR 10, ¶ 6, 132 P.3d 1, 2. A prior criminal history of non-violent offenses may support the existence of a continuing threat where the evidence shows that the slaying was callous and pitiless. Bush, 2012 OK CR 9, ¶ 43, 280 P.3d at 347; Grissom, 2011 OK CR 3, ¶ 62, 253 P.3d at 990.

¶100 Taking the evidence in the light most favorable to the State, we find that any rational juror could have found that Appellant's behavior had demonstrated a threat to society and a probability that this threat would continue to exist in the future. The facts of the crime itself demonstrated that Appellant would continue to present a threat to society after sentencing. Scott v. State, 1995 OK CR 14, ¶ 36, 891 P.2d 1283, 1296 (finding sheer callousness with which defendant commits a particular murder can support continuing threat aggravating circumstance); Hooks, 1993 OK CR 41, ¶ 33, 862 P.2d at 1282 (recognizing Court's holding that nature and circumstances of killing itself are sufficient to show propensity toward future acts of violence). Appellant's slaying of Henry was both brutal and callous. His treatment of her body after her death further evinced this fact.

¶101 In addition to the facts of the crime itself, the evidence showed that Appellant had violently attacked a family member. James Zolinski of the Will County Sheriff's Department in Illinois testified that on July 27, 2008, he responded to a domestic altercation involving a father and a son at Appellant's home. Deputy Zolinski found Appellant's stepfather, Farlan Huff, with facial injuries. Huff's eye was almost swollen shut. He also had a cut above it. Appellant was seventeen years old at that time. He did not have any injuries on this person. After interviewing all of the parties present at the home, Zolinski arrested Appellant for domestic abuse.

¶102 Farlan Huff testified and detailed what had occurred. Huff related that Appellant and he became embroiled in an argument after he reminded Appellant to complete his chore of taking the trash out. Appellant's mother, Dana Huff, heard the argument and came up to Appellant's room. She directed Appellant and Mr. Huff; "Just duke it out." Mistakenly, Mr. Huff took off his glasses and placed them on top of something. Before he turned completely back around, Appellant punched him in the eye. Appellant then placed Mr. Huff in a "sleeper hold" restricting the circulation in his neck. As Mr. Huff was starting to pass out, he called out; "Dana, if you let him --." Appellant did not stop until Mrs. Huff directed him to do so.

¶103 Appellant had training in hand-to-hand combat, in addition to his Naval training. Dana Huff and Albertha Bench testified that Appellant had received training in martial arts. Mrs. Bench indicated that Appellant practiced regularly while staying in her home. Clayton Jenson testified that Appellant desired to go to California and become a mixed martial arts fighter. Appellant's attack on Mr. Huff mirrored the choke-hold he later used to subdue Henry.

¶104 The evidence further showed that Appellant had a long history of sexually aggressive conduct towards females that escalated over time and culminated in him callously slaying Henry and pitilessly leaving her semi-nude body in a field. Karen Doyle testified that in July of 2005 she moved into the house behind Appellant's home. Appellant was fourteen years old at that time. On several occasions Doyle observed Appellant through a window as she swam in her backyard pool. Appellant appeared to be masturbating. During Labor Day Weekend, Appellant's sexual aggression toward Doyle intensified. Doyle heard Appellant shouting "F**k Me, F**k Me" as she came out of the water. When she glanced towards Appellant's home, she observed that Appellant was completely nude and leaning halfway out of his bedroom window with his hands in the air. Doyle was frightened and called the police. Although she continued to live behind Appellant's home, she remained fearful of him. Despite law enforcement's intervention, Doyle continued to notice someone peeking out of the blinds after this incident.

¶105 Appellant's criminal activity and level of violence continued to escalate after his discharge from the Navy. In what can only be perceived as an act of planning, Appellant began to approach those who appeared to be young and female in or near the convenience store. He made physical contact with their bodies and attempted to entice or lure them to be alone with him. The evidence showed that Appellant inappropriately touched sixteen-year-old Jesse Anderson only days before Henry's murder. Anderson testified that Appellant visited the sno-cone stand across the street from the Teepee Totem where she worked. Appellant spoke to Anderson but the conversation was nothing more than casual customer conversation. On June 2, 2012, Appellant chased Anderson as she was driving off in her car. He ran across the street and tapped on her car window until she stopped and rolled down the window. Appellant advised Anderson that he did not think it was right that she leave without them knowing each other's names. Anderson exchanged names with Appellant. When he stuck his hand out as if to shake her hand Anderson reciprocated the gesture. Instead of shaking hands, Appellant kissed Anderson's hand. He asked Anderson for her phone number, her address, where she was going, and if he could ever take her out on a date. Anderson was freaked out by Appellant's behavior. She did not feel that she knew Appellant well enough and did not consent to his kiss. She refused to provide Appellant the information he had requested and declined his request for a date. Anderson was sufficiently bothered by the incident that she reported it to her parents.

¶106 Thereafter, Appellant sexually assaulted Gina Mercer. 21 O.S.2011, § 112 (defining "sexual assault" to include "any type of sexual contact or behavior that occurs without explicit consent of the recipient including, but not limited to ... fondling"). Mercer testified that approximately four or five days before Henry's murder Appellant inappropriately touched her while she was shopping in the Teepee Totem. Mercer related that she entered the store with her daughter. Other than Appellant, no one else was in the store. Appellant came up behind Mercer while she was at the soda fountain. He put his arms around Mercer under her breasts. She exclaimed; "Don't touch me! I don't even know who you are," and slapped Appellant on the shoulder. In response, Appellant declared; "I'm sorry. I thought you were a high school girl." Mercer related that Appellant's actions were completely unwelcome, inappropriate and unacceptable. She reported this incident to the store owner. After Henry's death, Mercer realized the gravity of the situation and reported the incident to law enforcement.

¶107 The day before Henry's murder, Appellant had a lewd encounter with fifteen-year-old Breanna Stinchcomb while she was shopping at the Teepee Totem. 21 O.S.2011, § 1123 (lewdly touching, feeling or mauling the body of a child under 16 constitutes lewd molestation). Stinchcomb testified as to her eerie encounter with Appellant. She related that Appellant came up behind her while she was at the glass door to the refrigerated soda cans so she turned and walked to the candy section and picked up two packages of candy. Appellant followed her to the soda fountain machine. Although the cups were perfectly straight, Appellant came up next to her, reached his right arm around her and acted as if he was straightening up the cups. As he did so, the side of his body came into contact with Stinchcomb. Appellant commented on Stinchcomb's attractiveness. He moved his hand and asked her if she wanted to go in the back and exchange life stories. Stinchcomb declined Appellant's offer stating that her mother was outside waiting on her. Appellant continued to make Stinchcomb feel uncomfortable as he rang up her purchase at the register. He advised her that he was only working at the store to make enough money to get back into the Navy. He asked Stinchcomb about her interests. When he found out that Stinchcomb liked music, he advised her that he played the guitar and suggested that they hang out and play the guitar together. Appellant's actions scared Stinchcomb and she immediately advised her mother about his behavior once she was safely outside.

¶108 Appellant suggests on appeal that these incidents showed nothing more than "harmless indiscretion," "overly-friendly attempts to converse with women," or "crass" behavior. However, viewing these incidents in the context of the remainder of the evidence, we find that the incidents clearly demonstrate that Appellant's behavior displayed a pattern of escalation tending to indicate a likelihood of future violence.

¶109 We note that the evidence concerning Appellant's attempts to escape also tended to show that Appellant would be a continuing threat to society. The evidence showed that Appellant had fled from his unlawful transgressions in the past and committed additional crimes along the way. Deputy David Matthew Welsh of the Will County Sheriff's Office in Wilmington, Illinois testified that Appellant admitted to stealing a car while he was AWOL from the Navy. He hid at the home of one of his friends.

¶110 The State's evidence further established that while awaiting trial, Appellant escaped from a restraint chair and attempted to escape from the jail. Detention Officer, Timothy Jackson, testified that Appellant was placed into a restraint chair because he had rammed his head into a wall. Appellant escaped from the chair and into a different part of the jail. He took off his orange jail uniform, put on a trustee's green uniform, and used this uniform to gain entry into other areas of the jail. Supervisor, Nathan Hicks, testified that Appellant used the trustee's clothing to make his way towards the exit to the jail. As the jail employees searched for him, Appellant ducked into a holding cell near the jail's exit. When Hicks found Appellant hiding in the cell, Hicks asked him what he was doing. Appellant admitted that he was trying to get out. Detention Officer, Kyle Henson, asked Appellant what had been his whole point, and Appellant indicated; "It was worth a try."

¶111 Viewed in its entirety, Appellant's behavior coupled with the callous and pitiless nature of the slaying demonstrated a threat to society and a probability that this threat would continue to exist in the future. Thus, taking the evidence in the light most favorable to the State, we find that any rational trier of fact could have found the continuing threat aggravating circumstance beyond a reasonable doubt. Proposition IX is denied.

¶112 In Proposition X, Appellant contends that the especially heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague and overbroad. Similar to many others before him, Appellant argues that this Court's attempts to limit and narrow this aggravating circumstance have been unsuccessful. We have repeatedly rejected this claim. Martinez v. State, 2016 OK CR 3, ¶ 67, 371 P.3d 1100, 1116, cert. denied, ___ U.S. ___, 137 S.Ct. 386, 196 L.Ed.2d 304 (2016); Postelle v. State, 2011 OK CR 30, ¶ 84, 267 P.3d 114, 144; Cole v. State, 2007 OK CR 27, ¶ 37, 164 P.3d 1089, 1098. The argument and authorities which Appellant presents raise nothing new. We continue to find that the current uniform instructions defining this aggravating circumstance sufficiently narrow its application to pass constitutional muster. Id.; Postelle, 2011 OK CR 30, ¶ 84, 267 P.3d at 144.

¶113 Appellant also challenges the sufficiency of the evidence to show that the murder was especially heinous, atrocious, or cruel. Again, we review a challenge to the sufficiency of the evidence of an aggravating circumstance by taking the evidence in the light most favorable to the State to determine if any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt. Id.; DeRosa, 2004 OK CR 19, ¶ 85, 89 P.3d at 1153.

¶114 To prove that a murder is especially heinous, atrocious or cruel, the State must show: (1) the victim's death was preceded by torture or serious physical abuse; and (2) that the facts and circumstances of the case establish that the murder was heinous, atrocious, or cruel. Cuesta-Rodriguez v. State, 2010 OK CR 23, ¶ 78, 241 P.3d 214, 238. Torture in the context of this aggravating circumstance may take any of several forms including the infliction of either great physical anguish or extreme mental cruelty. Turrentine v. State, 1998 OK CR 33, ¶ 70, 965 P.2d 955, 976. As to the circumstance of extreme mental cruelty, the torture must produce mental anguish in addition to that which of necessity accompanies the underlying killing. Id. Anticipation of death is sufficient to support the mental anguish requirement of the aggravator. Postelle, 2011 OK CR 30, ¶ 83, 267 P.3d at 144. The length of time which the victim suffers mental anguish is irrelevant. Turrentine, 1998 OK CR 33, ¶ 70, 965 P.2d at 976; Neill v. State, 1994 OK CR 69, ¶ 60, 896 P.2d 537, 555; Berget v. State, 1991 OK CR 121, ¶ 31, 824 P.2d 364, 373. Instead, the analysis focuses on the acts of the petitioner and the level of tension created. Id.

¶115 Serious physical abuse is proved by showing that the victim endured conscious physical suffering before dying. Martinez, 2016 OK CR 3, ¶ 68, 371 P.3d at 1116. This Court has found sufficient evidence of serious physical abuse where the victim suffered numerous defensive wounds indicating that the victim was conscious and attempted to fight off her attacker. DeRosa, 2004 OK CR 19, ¶ 99 n. 166, 89 P.3d at 1157 n. 166; Cheney v. State, 1995 OK CR 72, ¶ 18 n. 22, 909 P.2d 74, 81 n. 22; Romano v. State, 1993 OK CR 8, ¶¶ 77-80, 847 P.2d 368, 386--87. "[S]o long as the evidence supports a finding that death was preceded by torture or serious physical abuse, the jury is permitted to consider all the circumstances of the case, including the attitude of the killer and the pitiless nature of the crime." Underwood v. State, 2011 OK CR 12, ¶ 64, 252 P.3d 221, 247 (quotation and citation omitted).

¶116 Appellant argues that the State failed to establish that Henry's death involved conscious physical suffering. "The crucial aspect of this aggravator is the victim's awareness." Id. Both torture and serious physical abuse require evidence of consciousness. Id.; Pavatt v. State, 2007 OK CR 19, ¶ 75, 159 P.3d 272, 294.

¶117 Taking the evidence in the light most favorable to the prosecution in the present case, we find that any rational trier of fact could have found that Henry suffered torture and serious physical abuse prior to her death. Appellant admitted to Dr. Grundy that he attacked Henry at the soda fountain. He struck Henry and strangled her with a choke-hold. Appellant also admitted to attacking Henry a second time on the floor in the stockroom of the store.

¶118 The evidence at trial revealed that Henry suffered serious physical abuse. Appellant subjected the teenager to a prolonged, brutal, and relentless attack. Appellant beat Henry so severely with his hands that they were demonstrably swollen to the law enforcement officers who came into contact with him after his arrest. The medical examiner, Dr. Inas Yacoub, testified that Henry had extensive blunt force trauma to her head, face, scalp, neck, back and upper torso. The trauma was so significant that Henry had bruising behind her sternum and bleeding in the lining of her airways. She had suffered a traumatic brain injury from the trauma to her head. Yacoub indicated that the numerous injuries could not be explained by a single impact.

¶119 Yacoub testified that Henry also had bruises on her legs, arms, and hands. Sufficient pressure had been applied to Henry's neck to cause the fracture of the cricoid cartilage and petechiae in both eyes. Henry also had pattern injuries on her head, neck, arm, and upper back which were consistent with the bottom of Appellant's shoes.

¶120 Based on the extensive injuries from the beating, any rational juror would also have recognized that Henry would have been under extreme mental anguish and emotional fear as she realized she was being beaten to death, one of the most agonizing ways a person can die. In addition, Dr. Yacoub's testimony suggested that Henry fought back in an effort to save her own life. Yacoub testified that Appellant had a bruise on his elbow and a bite mark where Henry had fought back. Yacoub noted that the bruises on Henry's right forearm were defensive in nature. Henry had numerous abrasions and a broken toe nail.

¶121 Although Dr. Yacoub could not determine at what exact point Henry became unconscious, she did not see any evidence that Henry was immediately rendered unconscious. She explained that the pattern injury depicted in State's Exhibit Number 504 where Appellant had apparently stomped on Henry's throat occurred, as with the great majority of the other injuries, while Henry was still alive. She detailed that Henry had injuries to both the inside and outside of her head consistent with her having been dragged across the floor while still alive and conscious. Yacoub related that the blood on Henry's face indicated that Henry was conscious after Appellant's attack on her torso and coughed out blood from her nose and mouth. She stated that Henry breathed in her own blood and had suffered the painful experience of air hunger as she tried to breathe but could not get air into her fluid filled lungs.

¶122 The photographs of Henry's injuries and the clothing that Appellant wore on the night of her death thoroughly corroborated Dr. Yacoub's account. Appellant did not present any evidence to contravene the State's evidence. Therefore, we conclude that, taking the evidence in the light most favorable to the prosecution in the present case, we find that any rational trier of fact could have found that Henry's murder was especially heinous, atrocious or cruel beyond a reasonable doubt. Proposition X is denied.

ISSUES CONCERNING BOTH STAGES

¶123 In Proposition VII, Appellant alleges that prosecutorial misconduct occurred during both stages of the trial. Our review for prosecutorial misconduct is well established. Relief will only be granted where the prosecutor committed misconduct that so infected the defendant's trial that it was rendered fundamentally unfair, such that the jury's verdicts should not be relied upon. Sanders v. State, 2015 OK CR 11, ¶ 21, 358 P.3d 280, 286, citing Donnelly v. DeChristoforo, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974). We evaluate alleged prosecutorial misconduct within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel. Id. We have long allowed counsel a wide range of discussion and illustration in closing argument. Id. Counsel are permitted to fully discuss from their standpoint the evidence, the inferences and deductions arising from it. Id.

¶124 Appellant, first, claims that the prosecutors introduced false or misleading testimony from Melissa Lynn. "The knowing use of false or misleading evidence important to the prosecution's case in chief violates the Due Process Clause of the Fourteenth Amendment." Omalza v. State, 1995 OK CR 80, ¶ 77, 911 P.2d 286, 307 (quotations and citation omitted). To prove such a claim on appeal the appellant bears the burden to establish (1) certain testimony was misleading, (2) the prosecution knowingly used the testimony and (3) the testimony was material to guilt or innocence. Id.

¶125 In the present case, nothing in the record supports Appellant's claim. Instead, Appellant cites to materials attached to Appellant's Application for Evidentiary Hearing on Sixth Amendment Claim filed contemporaneously with his appellate brief. The materials filed in support of a request for an evidentiary hearing are not considered, by reason of their filing with this Court, part of the trial record. Bland, 2000 OK CR 11, ¶ 115, 4 P.3d at 731. If the items are not within the existing record, then only if they are properly introduced at the evidentiary hearing will they be a part of the trial court record on appeal. Id. As the materials in the present case are not properly before the Court at this time, and Appellant has failed to develop his arguments in his appellate brief, without citation to the non-record materials, we find that he has effectively waived review of those arguments. We have consistently held that we will not review allegations of error that are neither supported in the record or by legal authority. Id. We will only consider the materials when we address the Application for Evidentiary Hearing on Sixth Amendment Claim.

¶126 Second, Appellant claims that the prosecutors misstated and improperly shifted the burden of proof concerning Appellant's insanity defense. We note that Appellant waived appellate review of this claim when he failed to challenge the prosecutor's remarks at trial. Malone, 2013 OK CR 1, ¶ 40, 293 P.3d at 211. We review the claim for plain error under the test set forth in Simpson and determine whether he has shown an actual error that is plain or obvious as set out in Proposition VI, above. Id., 2013 OK CR 1, ¶ 41, 293 P.3d at 211

¶127 Appellant argues that the prosecutor told the jury not to consider his mental health evidence. We find that Appellant's argument is not supported by the record. The prosecutor did not inform the jury to not consider the mental health evidence. Instead, the prosecutor informed the jurors that they need not decide Appellant's exact mental health diagnosis to determine his sanity. As the prosecutor properly focused the jury on determining whether Appellant knew right from wrong or could appreciate the nature and the consequences of his action, we find that the prosecutor's comments were proper. Pugh v. State, 1989 OK CR 70, ¶ 3, 781 P.2d 843, 843-44; Inst. No. 8-32, OUJI-CR(2d)(Supp.2014).

¶128 Appellant further argues that the prosecutors impermissibly shifted the burden of proof by arguing that it was Appellant's burden to prove insanity. He argues that the prosecutor compounded this error when he stated that Appellant had to prove insanity "beyond a reasonable doubt" in the rebuttal portion of closing argument. We note that there exists a presumption of sanity under Oklahoma law that continues until a criminal defendant presents sufficient evidence to raise a reasonable doubt as to his sanity at the time of the offense. Jackson v. State, 1998 OK CR 39, ¶ 64, 964 P.2d 875, 892. Only if a criminal defendant presents sufficient evidence to raise reasonable doubt as to his sanity, does the State bear the burden of proving beyond a reasonable doubt that the defendant was sane at the time of the commission of the offense. Id. In Taylor v. State, this Court found that a prosecutor's reference to the defendant's burden of raising a doubt as to sanity as "beyond a reasonable doubt" did not constitute fundamental error where the comment did not appear to be a blatant attempt to misstate the burden of proof and the jury was otherwise adequately instructed on the issue. Id., 1994 OK CR 61, ¶ 14, 881 P.3d 755, 759.

¶129 The record in the present case reveals that the trial court properly instructed the jury concerning the burden of proof for the defense of sanity with the uniform jury instructions. Inst. Nos. 8-32, 8-33, OUJI-CR(2d) (Supp.2014). In the initial part of closing argument, the prosecutor directed the jury to the trial court's instruction and correctly paraphrased the uniform jury instruction concerning Appellant's burden of proof. She accurately stated that Appellant had the burden of raising a reasonable doubt as to his sanity but that if he raised such a doubt, the State had the overall burden of proving sanity beyond a reasonable doubt. Defense counsel then directed the jury to the trial court's instruction and argued that the State had to prove that Appellant was sane because Appellant had raised a reasonable doubt as to his sanity. In rebuttal the second prosecutor, again, directed the jury to the trial court's instruction and correctly stated that Appellant was presumed sane and had the burden to prove that he was not sane. However, he mistakenly stated that Appellant's burden was "beyond a reasonable doubt."[11] It is apparent from these facts that the prosecutor's comment was not a blatant attempt to misstate the burden of proof. As the prosecutor correctly stated the burdens in her initial argument, defense counsel correctly stated the State's burden, and the trial court adequately instructed the jury on the issue, we find that the error was not plain or obvious in this instance.

¶130 Third, Appellant claims that the prosecutor improperly bolstered the testimony of Dr. Hall with hearsay. He does not challenge Hall's reliance or relation of the hearsay at trial but, instead, argues that the prosecutor improperly used the evidence during closing argument to argue that Appellant was deceptive to his own attorneys. We note that Appellant waived appellate review of this claim when he failed to challenge the prosecutor's remarks at trial. Malone, 2013 OK CR 1, ¶ 40, 293 P.3d at 211. We review the claim for plain error under the test set forth in Simpson and determine whether he has shown an actual error that is plain or obvious. Id., 2013 OK CR 1, ¶ 41, 293 P.3d at 211.

¶131 Appellant's claim is not supported by the record. The prosecutor's argument did not constitute improper bolstering. Marquez v. State, 1995 OK CR 17, ¶ 18, 890 P.2d 980, 985 (holding witness's prior consistent statement could not be admitted to bolster credibility of witness when witness had not been impeached). The prosecutor did not argue that Appellant had been deceptive to his own attorneys. Instead, the prosecutor properly summarized Hall's testimony concerning jailer Dallas Cowen's observation that Appellant's "behavior changed" "when the doctors and the lawyers showed up in the jail." The prosecutor's comment "still in that planning stage" suggesting that Appellant had planned his insanity defense from the very beginning of the offense was a reasonable inference based upon the evidence at trial. As the prosecutor's comments fell within the wide latitude afforded counsel during closing argument, we find that Appellant has not shown that error, plain or otherwise, occurred.

¶132 Fourth, Appellant argues that the prosecutor argued facts not in evidence when discussing the cash register receipt from the Teepee Totem. As Appellant failed to raise this challenge at trial, we find that he has waived appellate review of this issue for all but plain error, and review the claim for plain error pursuant to the test set forth in Simpson. Malone, 2013 OK CR 1, ¶ 40, 293 P.3d at 211.

¶133 Appellant introduced the cash register receipts from the Teepee Totem for the shift which he worked on the night of Henry's murder. The receipts illustrated that Appellant had used unconventional mathematics, somewhat similar to common core math, to calculate sales that evening. In closing argument, defense counsel asserted that the receipts evinced Appellant's psychotic break and insanity at the time of the offense. The prosecutor countered in rebuttal stating; "How many of you have been a clerk? How many of you have been bored out of your minds and decided to do something while you were sitting there? I have ran a business in the past, and I have seen clerks do stuff like that."

¶134 The prosecutor's request that the jurors use their own experience in assessing whether the odd entries were indicative of boredom or a psychotic break was entirely proper. A prosecutor may properly urge the jury to use common sense in assessing the evidence. See Harris v. State, 2000 OK CR 20, ¶ 37, 13 P.3d 489, 499.

¶135 We reach a different conclusion as to the prosecutor's comment on his own experience as a business owner. As the prosecutor injected facts not in the trial record, we find that the comment was improper and constituted an actual error that was plain or obvious. Dawkins v. State, 2011 OK CR 1, ¶ 19, 252 P.3d 214, 220 (finding prosecutor argued facts not in evidence where he referenced evidence not in the trial record). However, we find that the prosecutor's comment did not constitute plain error, because the isolated comment did not affect his substantial rights and Appellant was not prejudiced by the extra-record remark. Id.; Malone, 2013 OK CR 1, ¶ 41, 293 P.3d at 211 ("[T]his Court will correct plain error only if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings or otherwise represents a miscarriage of justice.") (quotations and citation omitted). As discussed in Proposition VI, the evidence would not have permitted the jury to find that Appellant was insane at the time of the offense. Therefore, no relief is required.

¶136 Fifth, Appellant argues that the prosecutor misstated the evidence concerning the mopped floor in the store and Appellant's farewell statement to his grandfather. As Appellant failed to raise this challenge at trial, we find that he has waived appellate review of this issue for all but plain error, and review the claim for plain error pursuant to the test set forth in Simpson. Malone, 2013 OK CR 1, ¶ 40, 293 P.3d at 211.

¶137 The law is clear that prosecutors may not misstate the evidence. Langley v. State, 1991 OK CR 66, ¶ 24, 813 P.2d 526, 531. However, they are permitted to comment upon the evidence and draw logical inferences therefrom. Grissom v. State, 2011 OK CR 3, ¶ 67, 253 P.3d 969, 992. A minor misstatement of fact will not warrant a reversal unless, after a review of the totality of the evidence, it appears the same could have affected the outcome of the trial. Langley, 1991 OK CR 66, ¶ 24, 813 P.2d at 531.

¶138 The prosecutor's suggestion in the present case that "[t]he floor around the soda fountain was wet, like it had been mopped" was reasonably based upon the evidence at trial. Tammy Wilkerson was the first person to discover the pool of blood in the storeroom of the Teepee Totem. She testified that she observed that the floor was a little wet near the fountain drink dispenser. Wilkerson unmistakably hesitated when defense counsel on cross-examination attempted to secure her affirmation that this was to be expected around a soda fountain. Deputy Michael Moore testified that he observed droplets of blood leading from the storeroom, through the store and out to the front doors. He further observed a utility sink, mop, and a mop bucket in the storeroom. Both Wilkerson and Moore testified that they observed a cup of ice with a clear liquid in it on the counter next to the soda dispenser. Based upon this evidence, we find that the prosecutor did not misstate the evidence.

¶139 It appears that the prosecutor made a minor misstatement of fact when he recounted Stanley Bench's testimony in closing argument. Bench did not testify that Appellant stated; "Good-bye, Grandpa. I love you. Don't get hurt." Instead, Bench indicated that when Appellant declared, "Pa, I love you," Bench had replied, "I do you, too. Be careful out there and don't get hurt." Reviewing the totality of the evidence, we find that this minor misstatement did not constitute plain error. Appellant was not prejudiced by the misstatement, and thus it did not affect his substantial rights. We conclude that plain error did not occur.

¶140 Sixth, Appellant argues that the prosecutor improperly impeached his mother, Dana Huff, during the second stage of the trial. He, first, claims that the prosecutor used a "mix-up" about her violation of the rule of sequestration to portray Huff as a liar and then imputed this circumstance to the remainder of her testimony. Appellant failed to raise this specific challenge before the trial court, therefore, we find that he has waived appellate review of this issue for all but plain error, and review the claim for plain error pursuant to the test set forth in Simpson. Malone, 2013 OK CR 1, ¶ 40, 293 P.3d at 211; Harmon v. State, 2011 OK CR 6, ¶ 36, 248 P.3d 918, 934 ("[W]hen a specific objection is made at trial, this Court will not entertain a different objection on appeal.").

¶141 We are unpersuaded by Appellant's argument. We note that the trial court is permitted to fashion a proper remedy for the violation of the rule of sequestration. See McKay v. City of Tulsa, 1988 OK CR 238, ¶ 6, 763 P.2d 703, 704 (holding trial court properly allowed witness to take the stand despite violation of rule of sequestration); Villanueva v. State, 1985 OK CR 8, ¶ 2, 695 P.2d 858, 860 (disagreeing with appellant's contention that exclusion of witness is mandatory result of violation of the rule). We further note that generally, the State is permitted to cross-examine the defendant's witnesses at trial concerning any matter which is responsive to testimony given on direct examination or which is material or relevant thereto and which tends to elucidate, modify, explain, contradict or rebut testimony given in chief by the witness. Malone, 2013 OK CR 1, ¶ 45, 293 P.3d at 212.

¶142 Reviewing the record, we find that there was no "mix-up." Defense counsel invoked the rule of sequestration immediately prior to opening statements in the first stage of the trial. When defense counsel called Appellant's mother to testify, the State approached and alleged a violation of the rule. During the in camera hearing held on this issue, Huff admitted to violating the rule and speaking to her husband about his testimony after he had testified, as well as speaking to another listed witness about his expected testimony. Acknowledging this fact, defense counsel suggested that cross-examination as to credibility was the proper remedy instead of exclusion of Huff's testimony. Huff testified in Appellant's defense. On cross-examination, she very reluctantly admitted to violating the rule. As Huff clearly violated the rule of sequestration, we find that the prosecutor properly impeached her with this fact.

¶143 Second, Appellant argues that the State impermissibly implied that Mrs. Huff lied during her son's enlistment with the Navy. Dr. Grundy admitted during his testimony that contrary to their statements to him both Appellant and Mrs. Huff had certified that Appellant did not have any educational, medical, psychiatric, psychological, emotional or mental health problems on his enlistment forms with the Navy. They further certified that Appellant did not have trouble sleeping and had never attempted suicide. Huff testified and acknowledged Appellant's educational, medical, emotional, and mental health problems as he was growing up. She claimed that Appellant had always had trouble sleeping and focused on harming himself during the time that he was on medication to help his inability to focus. When the prosecutor confronted Huff with her lie to the Federal Government, Huff was evasive and refused to acknowledge her untruthfulness. She claimed that she did not remember the Navy asking her about Appellant's educational history and only admitted to lying about Appellant's bouts of sleeplessness if they had, in fact, asked that question. She explained her denial of Appellant's psychiatric history explaining that she did not feel that Appellant had any psychiatric issues before joining the Navy. Ultimately, she admitted to presenting a falsehood to the officer that investigated the domestic violence incident between Appellant and Farlan Huff. She further admitted that she had run interference for Appellant his whole life. As the prosecutor's questions to Huff tended to contradict or rebut her testimony given on direct, we find that Appellant has not shown that an error, plain or otherwise, occurred. The prosecutor's cross-examination was proper.

¶144 Finally, Appellant argues that the prosecutor improperly invoked sympathy for the victim during second stage closing argument. Appellant failed to raise this specific challenge before the trial court, therefore, we find that he has waived appellate review of this issue for all but plain error, and review the claim for plain error pursuant to the test set forth in Simpson. Malone, 2013 OK CR 1, ¶ 40, 293 P.3d at 211; Harmon, 2011 OK CR 6, ¶ 36, 248 P.3d at 934.

¶145 This Court has consistently held it is improper for the prosecution to attempt to elicit sympathy for victims. Garrison v. State, 2004 OK CR 35, ¶ 117, 103 P.3d 590, 610--11. However, we have distinguished between the instance where a prosecutor "overtly sought sympathy for the victims" and the instance where the prosecutor's comments likely evoked an emotional reaction but were reasonable inferences based upon the evidence at trial. Jackson v. State, 2007 OK CR 24, ¶ 27, 163 P.3d 596, 604. Comments which are not a deliberate attempt to elicit sympathy but are reasonable inferences based upon the evidence generally fall within the wide range of permissible argument. Id.; Bland, 2000 OK CR 11, ¶ 97, 4 P.3d at 728.

¶146 Appellant claims that the prosecutor invoked sympathy by injecting her own thoughts and emotions during closing argument. The prosecutor's comment that she had been upset about missing her daughter's Ag show that day until she saw Henry's parents and realized that she had been selfish was borderline. Although the prosecutor's comment placed importance on focusing on the trial at hand, her personal observations were irrelevant and the comment had the potential to invoke sympathy. However, we do not find that the prosecutor's self-absorbed statement constituted plain error. Appellant claims that the prosecutor asked the jurors to imagine their daughters and nieces in Henry's circumstances. Although we have cautioned prosecutors against encouraging jurors to imagine themselves as the victim during the offense, we have concluded that these types of comments do not constitute plain error. Browning v. State, 2006 OK CR 8, ¶ 37, 134 P.3d 816, 839. Taking the prosecutor's comments in context, we find that Appellant's claim is not supported by the record. The prosecutor did not ask the jurors to imagine their daughters and nieces in Henry's circumstances. Instead, while comparing the diverse responses of the differently aged women to Appellant's aggressive sexual behavior, the prosecutor asked the jurors if Appellant's unwelcome physical contact with several of the young female witnesses would be a "big deal" if it had occurred to their daughter or niece. As the prosecutor did not ask the jurors in the present case to place either themselves or their relatives in the victim's circumstances, we find that plain error did not occur.

¶147 Appellant also claims that the prosecutor invoked sympathy for Henry when he asked the jurors to listen for a voice that was no longer there during the rebuttal portion of the State's closing argument. While the prosecutor should not encourage the jury to impose the death penalty out of sympathy for the victim, we find that the prosecutor's comment did not rise to the level of plain error. Pickens v. State, 2001 OK CR 3, ¶ 40, 19 P.3d 866, 880 (finding prosecutor's request for jurors to remember that last person the victim saw was the defendant and the last sound the victim heard was sound of thunder from gun did not rise to the level of plain error). We note that the victim's silence occurred as a result of Appellant's criminal act and thus the prosecutor's argument was reasonably based upon the evidence at trial.

¶148 Finally, Appellant claims that the prosecutor invoked sympathy when he compared the in-life photograph of Henry with one of the post-mortem photographs of her. We are not persuaded by this argument.

¶149 The record reveals that the State introduced as State's Exhibit Number 1 a recent school portrait of Henry to show her general appearance and condition before her death pursuant to 12 O.S.Supp.2003, § 2403. During second stage closing argument the prosecutor compared the in-life photo with a post-mortem photo depicting the injuries to Henry's head, face, neck, and shoulders. The prosecutor stated that one image reflected Henry before Appellant's attack and the other image reflected her appearance after Appellant was done with her. Appellant's suggestion that members of the public gasped during this display is not supported by the record. The affidavit which he references is not part of the record and we do not consider it. Bland, 2000 OK CR 11, ¶ 115, 4 P.3d at 731. The trial court instructed the jurors to not let sympathy, except for the defendant, enter into its deliberations.

¶150 The prosecutor's contrasting of the two images did not render Appellant's trial fundamentally unfair. See Mitchell, 2011 OK CR 26, ¶ 75, 270 P.3d at 179, overruled on other grounds by Nicholson v. State, 2018 OK CR 10, ¶¶ 11-12, 421 P.3d 890, 895 (finding prosecutor's display and contrasting of pre-death and post-mortem photographs in closing argument did not deny appellant a fair trial). In short, the prosecutor's actions did not unfairly evoke sympathy for the victim so much as it underscored the nature of Appellant's crime. As the prosecutor's display was reasonably based upon the evidence at trial we conclude that Appellant has not shown that plain error occurred.

¶151 Reviewing the entire record, the cumulative effect of the prosecutor's comments and conduct did not deprive Appellant of a fundamentally fair trial or sentencing proceeding. The evidence strongly supported the jury's determination of both guilt and recommendation as to sentence. Proposition VII is denied.

¶152 In Proposition VIII, Appellant raises several challenges to the admission of State's Exhibit Number 1, the in-life photograph of Henry. The State introduced the photo pursuant to the language within 12 O.S.Supp.2003, § 2403 allowing the admission of a photograph of a criminal homicide victim while alive.

¶153 Appellant, first, asserts that this statutory provision is unconstitutional. He argues that in-life photographs are never relevant and inject passion and sympathy into the trial proceedings. This Court has repeatedly rejected these arguments. Grant v. State, 2009 OK CR 11, ¶ 52, 205 P.3d 1, 22; Glossip, 2007 OK CR 12, ¶¶ 77-80, 157 P.3d at 156-57; Coddington v. State, 2006 OK CR 34, ¶¶ 53--57, 142 P.3d at 452--53. The arguments and authorities which Appellant presents raise nothing new. Marquez-Burrola v. State, 2007 OK CR 14, ¶¶ 29-31, 157 P.3d 749, 760. We continue to find that this statutory provision is constitutional.

¶154 Appellant further argues that, under the circumstances of this case, the in-life photo was more prejudicial than probative. He asserts that the prosecutor's comparison of the in-life photograph of Henry with a post-mortem photograph of her during second stage closing argument rendered his trial fundamentally unfair.[12] We determined in Proposition VII that the prosecutor's act of displaying these images did not render Appellant's trial fundamentally unfair.

¶155 The photograph admitted in the present case was an appropriate snapshot of the decedent offered to show her general appearance and condition while alive. During second stage closing argument the prosecutor compared the in-life photo with a photo of Henry's body shortly after it was discovered. The post-mortem photo depicted the injuries to Henry's head, face, neck, and shoulders. Comparison of these two photos was the only means to grasp the true extent of Henry's injuries and the nature of Appellant's crime. As the contrasting images tended to establish both serious physical abuse and the calloused nature of Appellant, the photos held great probative value concerning the State's alleged aggravating circumstances. Giving the in-life photo its maximum reasonable probative force and its minimum reasonable prejudicial value, we find that the photo's probative value was not substantially outweighed by its prejudicial effect. Mayes, 1994 OK CR 44, ¶ 77, 887 P.2d at 1310. Proposition VIII is denied.

ALLEGATIONS OF INEFFECTIVE ASSISTANCE OF COUNSEL

¶156 In Proposition IV, Appellant challenges the effectiveness of defense counsel in both stages of the trial. This Court reviews ineffective assistance of counsel claims under the two-part test mandated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Malone, 2013 OK CR 1, ¶ 14, 293 P.3d at 206. The Strickland test requires an appellant to show: (1) that counsel's performance was constitutionally deficient; and (2) that counsel's deficient performance prejudiced the defense. Id.

¶157 The Court begins its analysis with the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. Appellant must overcome this presumption and demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. Id.

¶158 When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed. Malone, 2013 OK CR 1, ¶ 16, 293 P.3d at 207. To demonstrate prejudice an appellant must show that there is a reasonable probability that the outcome of the trial would have been different but for counsel's unprofessional errors. Id. "The likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2011). When a defendant challenges a death sentence, the question is whether there is a reasonable probability that, absent counsel's errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Strickland, 466 U.S. at 695, 104 S.Ct. at 2069.

¶159 Appellant raises several claims of ineffective assistance predicated on circumstances within the record on appeal. He, first, claims that defense counsel was ineffective for failing to object to several of the instances he alleged constituted prosecutorial misconduct in Proposition VII. We determined in Proposition VII that the challenged comments and conduct did not deprive Appellant of a fundamentally fair trial and sentencing proceeding. As such, we find that Appellant has not shown a reasonable probability that the outcome of the trial would have been different but for counsel's alleged failures. Glossip, 2007 OK CR 12, ¶ 113, 157 P.3d at 161 (rejecting ineffective assistance of counsel claim where underlying claim did not rise to the level of plain error).

¶160 Second, Appellant claims that counsel was ineffective for failing to object to the expert testimony of Dr. Terese Hall which he argued was improper in Proposition VI. We determined in that Proposition that Appellant had not shown that Dr. Terese Hall's testimony constituted plain error. As such, we find that Appellant has not shown ineffective assistance of counsel under Strickland. Id., 2007 OK CR 12, ¶ 112, 157 P.3d at 161.

¶161 Third, Appellant claims that counsel was ineffective for failing to impeach Dr. Hall's testimony. He argues that counsel should have impeached Hall with Clayton Jenson's trial testimony. Solely citing Jenson's testimony for the defense, Appellant asserts that defense counsel could have undercut Dr. Hall's testimony by questioning her concerning Jenson's statements. Taking Jenson's testimony in the full context of the trial, we find that Appellant has not shown that counsel's conduct fell outside the wide range of reasonable professional assistance.

¶162 Appellant's cousin, Clayton Jenson, testified for both the State and the defense at trial. Although Jenson extrapolated on his statements as the trial went on, his account remained consistent. Jenson testified in the State's case-in-chief that he regularly spoke with Appellant and spent approximately 2 hours with Appellant on the day of Henry's murder. He indicated that Appellant was able to engage him in meaningful conversation and they discussed their future plans together that day. Although Appellant had previously voiced concerns that other people might think he was different or crazy, Jenson did not see any sign of these things. Jenson testified that he did not see anything wrong with Appellant on the day of Henry's death.

¶163 Jenson expounded on Appellant's concerns while testifying in Appellant's defense. He recounted that Appellant had talked about things bothering him in his room, like a demon. Appellant had also stated that a man and a woman were hunting him, trying to find him and kill him, because he knew too much from what he had done in the military. He had claimed that he had a chip in his brain like a universal soldier science project and proclaimed that he was afraid of going to the doctor for fear that he would be committed. Jenson advised that Appellant has stated that he had gone days without sleeping.

¶164 On cross-examination, Jenson affirmed that he did not believe that there was anything wrong with Appellant during the two weeks preceding Henry's death. He explained that he did not believe Appellant's statements at that time. Jenson related that Appellant was clean and had good hygiene. He had meaningful conversations with Jenson. He was rational during these conversations and Jenson did not see anything to indicate that Appellant had any problem. Jenson testified that, consistent with his former testimony, he still did not believe that there was anything wrong with Appellant.

¶165 On redirect, defense counsel secured Jenson's affirmation that he did not want to believe Appellant's statements at the time. Jenson also affirmed that he had just blown Appellant off because he did not want to hear it.

¶166 Dr. Hall testified in rebuttal for the State. She indicated she relied upon information from Jenson in forming her opinion that Appellant was sane at the time of Henry's murder. Hall observed that Jenson's statements to her two years after Henry's death were consistent with his initial statements. Jenson reported that Appellant and he were about the same age and spent quite a bit of time together, including on the day of the offense. Jenson did not see anything wrong with Appellant and believed that he was normal.

¶167 When defense counsel cross-examined Hall, he did not seek to impeach Hall with Jenson's testimony for the defense. However, we find that counsel's omission did not constitute ineffective assistance of counsel. As outlined above, Jenson's testimony remained consistent. He wholly acknowledged Appellant's claims but consistently maintained that he did not believe that Appellant had mental health problems based upon the fact that he did not see any signs to support Appellant's claims. Even after disclosing the nature and extent of Appellant's claims, Jenson explicitly testified that, consistent with his former testimony, he still did not believe that there was anything wrong with Appellant. Since Jenson's testimony in defense would not have undercut his statements to Hall or his testimony in the State's case-in-chief, we find that counsel's conduct fell within the wide range of reasonable professional assistance.

¶168 Appellant also argues that counsel was ineffective for failing to impeach Dr. Hall with her testimony in another case. He cites to this Court's unpublished opinion in Fears v. State, F-2004-1279 (Okla. Cr., July 7, 2006) as evidencing Dr. Hall's testimony. However, Appellant has not provided any authority establishing that defense counsel would have been able to use this Court's unpublished opinion to impeach Dr. Hall. Although the author of Fears described certain statements from Dr. Hall's testimony in that case, this Court's opinion in Fears does not constitute Dr. Hall's prior testimony. See Roy v. State, 2006 OK CR 47, ¶ 20, 152 P.3d 217, 224 n. 20 (finding transcript constitutes official record of the case); Rule 2.2(D), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2017) ("The transcript prepared by the court reporter shall constitute the record of the proceedings from which it was transcribed."). Dr. Hall's testimony from Fears is not within the record on appeal and Appellant has not sought to supplement the record with the official court reporter's transcripts from that trial. As such, we must conclude that Appellant has not shown that counsel's performance was constitutionally deficient.

¶169 Even if we were to consider the statements which Appellant recounts from Fears, we would find that it did not undermine Dr. Hall's testimony in the present case. Hall's testimony did not materially differ. To the contrary, the facts in Fears actually reveal that Hall's testimony remained consistent. The officers who arrested the defendant in Fears observed signs of mental illness in him and the defendant, himself, verbalized a delusion to one of the officers. These were the very circumstances which Dr. Hall cited as missing from Appellant's conversations with Clayton Jenson, Stanley Bench, Deputy Quinton Short, and Detention Officer Brown and which led her to conclude that Appellant had not suffered a psychotic break. Therefore, we are forced to conclude that Appellant has not shown that there is a reasonable probability that the outcome of the trial would have been different but for counsel's failure to use Hall's testimony from the Fears case.

¶170 Appellant also argues that counsel should have impeached Dr. Hall with the conclusions of Scott Orth, Ph.D. and Peter Rausch, Ph.D. of the Oklahoma Forensic Center. We note that Dr. Orth's competency report and Dr. Rausch's testimony from Appellant's competency trial were both filed of record in the case and are among the items which Dr. Hall reviewed in formulating her opinion at trial.

¶171 Although this information was readily available to impeach Dr. Hall at trial, we are not convinced that the conclusions of Dr. Orth and Dr. Rausch were favorable to Appellant's defense because their observations and conclusions were more consistent with Dr. Hall's testimony than Appellant's own expert. Dr. Grundy testified that Appellant appeared psychotic when he visited him. Grundy did not find any evidence of malingering. He found that Appellant suffered active symptoms of mental illness, such as delusions and hallucinations, which caused him not to understand the legal wrongness of his behavior at the time of the offense.

¶172 Dr. Orth's report contrasted with Grundy's findings. Orth clearly found evidence of either fabrication or feigning when he evaluated Appellant in February of 2013. Dr. Orth did not see any overt evidence of Appellant's self-proclaimed hallucinations or delusions and noted that Appellant gave "vague and unusual responses regarding his experiences of psychiatric symptoms." Orth assessed Appellant with the MMPI-2 to determine whether Appellant was "feigning psychopathology." He wrote in his report that the testing indicated that Appellant "may have been responding to items in a manner to communicate that he is very psychologically disturbed when in fact that is not the case" or "he may have been responding to items in a manner to draw attention to negative characteristics, exaggerating his self-reported psychological symptoms as a plea for help." Orth did not conclusively determine whether Appellant was faking or exaggerating his symptoms. Instead, he wrote that it was his "conservative opinion" that it was more likely that Appellant had exaggerated his psychological symptoms as a plea for help. Ultimately, Orth determined that Appellant was not a person requiring treatment.

¶173 Although Orth's "conservative opinion" did not exactly match Hall's conclusion that Appellant was malingering, overall Orth's report tended to corroborate Dr. Hall's testimony. Hall testified that Appellant's results on the two scales for assessing over-reporting or exaggeration on the MMPI-2 were extremely high. Appellant admits that the results of Dr. Orth's administration of the exam to Appellant were similar to the results which Dr. Hall obtained. Orth's report was consistent with Dr. Hall's explanation that she did not see any overt evidence of psychosis during her evaluation of Appellant. It also corroborated Hall's account that Appellant's report of delusions was very unusual.

¶174 As with Dr. Orth, we find that Dr. Rausch's testimony tended to corroborate Hall's observations and opinion. Dr. Rausch testified that he performed an outpatient evaluation with Appellant in March of 2014. The evaluation took place in an interview room over the course of approximately one hour. Rausch did not see any need to retest Appellant and simply relied upon his coworker, Dr. Orth's, prior testing of Appellant. Rausch indicated that he agreed with Orth's interpretation of Appellant's MMPI-2 testing. He indicated that the results revealed either that Appellant was "feigning psychological symptoms and pathology" or was endorsing a lot of symptoms and over-reporting as a cry for help. Rausch also testified that Appellant engaged in fairly unusual behavior during his evaluation. Dr. Rausch did not have any reason to dispute Orth's finding that Appellant did not have any substantial symptoms. Each of these findings was consistent with Dr. Hall's observations and tended to contradict Dr. Grundy's testimony. As such, we find that Appellant has not shown that counsel's performance fell outside the wide range of reasonable professional assistance.

¶175 Similarly, Appellant has not shown prejudice from counsel's omission. The evidence at trial strongly indicated that Appellant was sane at the time of the offense. When Appellant enlisted in the Navy in November of 2011, his mother verified that he did not have any mental health issues. The Navy had a doctor examine Appellant and he certified that Appellant did not have any psychiatric issues. After Appellant was discharged for going AWOL, his stepfather had him seen by a mental health professional on two separate occasions. Neither mental health professional determined that Appellant was a person requiring treatment.

¶176 Appellant's actions on the day of the murder evinced his sanity. Neither Stanley Bench nor Clayton Jenson observed Appellant acting out of the ordinary that night. Appellant did not report any delusions to them. Appellant's behavior immediately after killing Henry appeared to be rational, goal-oriented action. He quickly attempted to conceal the crime by secreting Henry out of the store and hiding her body in a semi-secluded area near his home. Appellant attempted to escape from the State in Henry's car after washing himself and covering up his blood soaked clothes.

¶177 Appellant acted coherent and rational when he later interacted with the law enforcement officials that night. He appeared lucid and normal to both Deputy Quinton Short and Detention Officer Kendall Brown. Dr. Grundy admitted that there was not any independent evidence to corroborate Appellant's claimed delusions.

¶178 The audio tape of Appellant's conversation with Brown was convincing. Appellant did not relate any delusions during the conversation. He was self-directed and voluntarily initiated a discussion with Brown concerning the viability of an insanity defense. Appellant's comments illustrated his prior knowledge concerning psychological evaluations and feigning mental illness.

¶179 The evidence also strongly suggested that Appellant was feigning mental illness. Although Appellant had passed Dr. Grundy's tests for malingering, Appellant's test results on the MMPI-2 tended to indicate that he was feigning or over-reporting symptoms. Appellant took two MMPI-2 tests. Both tests indicated that Appellant was feigning or over-reporting mental health symptoms. When Dr. Hall gave Appellant the MMPI-2 after Grundy's evaluation, the scores indicated that Appellant was exaggerating and over-reporting. Even Dr. Grundy had to admit that Appellant might not be the most truthful person in the world.

¶180 Dr. Hall did not see any evidence of severe psychosis in Appellant. At the time of trial, Appellant still maintained that he was not mentally ill. None of the seven separate mental health professionals who had evaluated Appellant found that he was a person requiring treatment. Only Dr. Grundy had diagnosed Appellant as insane on the night of the offense. Despite Grundy's belief that Appellant had schizophrenia and was psychotic when he first evaluated him, Appellant was able to appear at trial and participate in his defense without taking any medication for the condition.

¶181 In light of the evidence of Appellant's sanity and feigning we conclude that the evidence would not have permitted the jury to find that Appellant was insane at the time of the offense. Accordingly, we find that Appellant has not shown a reasonable probability that the outcome of the trial would have been different had counsel attempted to impeach Dr. Hall with Dr. Orth's competency report and Dr. Rausch's testimony from the competency trial.

¶182 Fourth, Appellant asserts that counsel was ineffective because she wholly abandoned the theme that he was a severely mentally ill individual during the second stage of the trial. He alleges that this caused an unreasonable inconsistency between his first and second stage defenses. We find that Appellant's assertion is not supported by the record. Counsel emphasized Appellant's mental health issues during both stages of the trial.

¶183 Although counsel did not explicitly mention the term "schizophrenia" during the second stage, counsel presented testimony from several witnesses concerning Appellant's mental health. She introduced testimony from Naval Chief, Andre Southerland, who had overseen Appellant's training in boot camp. Chief Southerland had sent Appellant for a psychiatric evaluation during his extended time in boot camp. Counsel also called Appellant's best friend, Anthony Michael Popovich, to testify. Popovich interacted with Appellant while he was AWOL from the Navy and testified as to Appellant's mental state during this time. Popovich related that Appellant appeared disturbed, acted paranoid, and informed him that he was working "Special Ops" doing top secret work for the Navy. Defense counsel introduced Rebecca Becker's testimony that Appellant appeared both disoriented and scared at the arraignment following his arrest for stealing a vehicle while AWOL. She also presented Farlan Huff's testimony concerning Appellant's mental health and his attempts to have Appellant admitted for treatment after he came home from the Navy. Counsel called Sharon Clements of Ada's Program of Assertive Community Treatment to explain why they were unable to help Appellant.

¶184 Counsel's second stage closing argument emphasized that Appellant's mental health problems played a large role in his life and were mitigating. Thus, the record reflects that defense counsel presented a consistent defense across both stages of the trial centering upon a downturn in Appellant's mental health following his time in the Navy. As such, we find that Appellant has not shown that counsel's performance fell outside the wide range of reasonable professional assistance.

¶185 Appellant also raises several claims of ineffective assistance of counsel predicated on circumstances outside the record. Simultaneous with the filing of his Brief, Appellant filed his Application for Evidentiary Hearing on Sixth Amendment Claim. Appellant seeks to supplement the record on appeal pursuant to both Rule 3.11(A) and 3.11(B), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2017) and requests an evidentiary hearing on his claims of ineffective assistance. We must address Appellant's application before we can determine his claims of ineffective assistance.

¶186 This Court analyzes requests to supplement the record which are based upon ineffective assistance of counsel claims pursuant to Rule 3.11(B). Day v. State, 2013 OK CR 8, ¶ 10, 303 P.3d 291, 297. Rule 3.11(A) solely allows this Court to supplement the record on appeal with items admitted during proceedings in the trial court but which were not designated or actually included in the record on appeal. Id.; McElmurry v. State, 2002 OK CR 40, ¶ 167, 60 P.3d 4, 36 (holding Rule 3.11(B) strictly limits supplementation under Rule 3.11(A) to matters which were presented to the trial court). Rule 3.11(A) is not intended to allow parties to bolster a trial record with extra-record documents or evidence. Id. In contrast, Rule 3.11(B)(3)(b) enables an appellant to qualify for an evidentiary hearing to support his or her claim of ineffective assistance of counsel by submitting affidavits and extra-record documents attached to his application for evidentiary hearing. Hancock v. State, 2007 OK CR 9, ¶ 112, 155 P.3d 796, 822, overruled on other grounds by Williamson v. State, 2018 OK CR 15, 422 P.3d 752.

¶187 As Appellant has not argued for supplementation with items admitted during proceedings in the trial court but which were not designated or actually included in the record on appeal, we find that his request for supplementation under Rule 3.11(A) must be denied. We review his request to supplement the record in support of his Sixth Amendment claim pursuant Rule 3.11(B)(3)(b).

¶188 This Court reviews an application under Rule 3.11(B)(3)(b) pursuant to the analysis set forth in Simpson v. State, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905--906. We review and consider an appellant's application and affidavits along with other attached non-record evidence to determine whether the appellant has provided sufficient information to show this Court by clear and convincing evidence that there is a strong possibility trial counsel was ineffective for failing to utilize or identify the evidence at issue. Id. This standard is less demanding than the test imposed by Strickland. Id.

¶189 Reviewing Appellant's application under this standard, we find that he has not shown clear and convincing evidence that there is a strong possibility that counsel was ineffective for failing to identify or utilize the proffered evidence. Appellant asserts in his application that counsel was ineffective for failing to effectively cross-examine his co-worker at the Teepee Totem, Melissa Lynn. Arguing that Lynn's testimony at trial was in direct conflict with her statement to the police, Appellant refers us to Exhibit "1" to his application. This exhibit appears to be a copy of the DVD recording of Lynn's statement to Law Enforcement. Lynn's statements to the investigating officer in Exhibit "1" substantially conformed to her testimony at trial. The only exception was that Lynn informed the investigating officer that Appellant was slow and was not catching on. She explained that part of the reason that Appellant was slow was because he was young and liked to flirt with every girl that came into the store.

¶190 It appears that the State provided Exhibit "1" to the defense prior to trial. Comparing Lynn's testimony at trial with Exhibit "1" we find that Lynn's testimony was not false or misleading. Although defense counsel did not impeach Lynn with her prior statement that Appellant was slow and was not catching on, we find that Appellant has not shown that defense counsel's decision could not be considered sound trial strategy. Since Lynn partly attributed Appellant's slowness to the fact that he was young and liked to flirt with every girl that came into the store, we find that it was reasonable for counsel to omit this impeachment evidence. Delving into this topic with Lynn had the potential to undercut the defense's other evidence that Appellant was actually slow. Clearly, the defense wanted to avoid portraying Appellant as having approached other young females in the store.

¶191 We further find that Appellant has not shown that there is a reasonable probability that the outcome of the trial would have been different had defense counsel impeached Lynn. We note that defense counsel presented the testimony of several teachers and neighbors from Appellant's childhood. These individuals testified that Appellant had a learning disability and was in special education classes as he grew up. Counsel also presented Chief Southerland's testimony that Appellant required extra attention and did not do well in boot camp because he was slow and could not complete more than a 3 step process. Southerland sent Appellant to the Navy's special program which was akin to special education; however, it was apparent that Appellant was not going to complete boot camp even before he went AWOL. This testimony more than subsumed the evidence which Appellant contends defense counsel should have introduced. Accordingly, we find that Appellant has not shown clear and convincing evidence of a strong possibility that trial counsel was ineffective for failing to impeach Lynn with the proffered evidence. Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905--906.

¶192 Appellant further asserts in his application that counsel was ineffective for failing to impeach Lynn with the civil lawsuit which Henry's family filed against Appellant, the Teepee Totem, and its owners. He refers us to Exhibit "2" to his application. This exhibit appears to be a copy of a Petition alleging that Appellant, the Teepee Totem, and its owners we liable for the wrongful death of Henry. Lynn is not mentioned in the alleged petition.

¶193 Appellant has not provided any authority establishing that defense counsel would have been able to use this lawsuit to impeach Lynn. As Appellant has failed to establish that counsel's performance was constitutionally deficient, we, again, find that Appellant has not shown clear and convincing evidence of a strong possibility that trial counsel was ineffective for failing to utilize or identify the proffered evidence. Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905--906.

¶194 Appellant further asserts in his application that counsel was ineffective for failing to challenge Dr. Hall's opinion that he was "malingering" or "faking" mental illness and her suggestion that it was easy to fool the Structured Interview of Reported Symptoms ("SIRS). Appellant argues that counsel should have called Dr. Grundy to testify in surrebuttal and impeach Dr. Hall's testimony on these points. He refers us to Exhibit "4" to his application. This exhibit is the affidavit of Dr. Curtis Grundy, Appellant's psychological expert from trial. The affidavit alleges that Dr. Grundy consulted with the defense team after Dr. Hall's testimony and informed them that he would not recommend his testifying in surrebuttal. Now, in hindsight, Grundy believes that if he had testified he could have challenged Dr. Hall's testimony suggesting that Appellant was "malingering" or "faking."

¶195 We refuse to review counsel's performance in the lens of hindsight. Robinson v. State, 1997 OK CR 24, ¶ 21, 937 P.2d 101, 108. Defense counsel's apparent reliance upon Dr. Grundy's expertise in determining whether to call him in surrebuttal was a strategic decision. That Grundy and appellate counsel have now imagined ways to impeach Dr. Hall is not persuasive. See Hancock, 2007 OK CR 9, ¶ 113, 155 P.3d at 822 ("Imaginative criticisms of trial counsel's performance issue all too readily from the gainful vantage of a zealous hindsight."

¶196 We further find that Appellant has not shown a reasonable probability that the outcome of the trial would have been different had counsel called Grundy in surrebuttal. Grundy's testimony at trial concerning "malingering" and "faking" was consistent with Dr. Hall's trial testimony. Dr. Grundy recounted that he gave Appellant two different tests to determine if he was malingering. One of the tests assessed "feigning or fabricating symptoms of mental illness" and the other test assessed "whether someone is trying to feign or fake memory impairment." Dr. Grundy agreed that equating malingering with "faking" was a lay-person's way of viewing it. On cross-examination, Grundy admitted that Appellant was not the most truthful person. Accordingly, we find that Appellant has not shown clear and convincing evidence of a strong possibility that trial counsel was ineffective for failing to call Dr. Grundy in surrebuttal. Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905--906.

¶197 Appellant further asserts in his application that counsel was ineffective for failing to present the testimony of a mitigation specialist in the second stage of the trial. He refers us to Exhibit "3" of his application. This exhibit is the affidavit of David Musick, Ph.D., a retired sociologist from the University of Northern Colorado, who claims to be a mitigation specialist. Dr. Musick alleges that he was retained to construct a social history in Appellant's case; reviewed all of the material which counsel sent him; interviewed Appellant, his mother, and half-brother; prepared a report; appeared at Appellant's trial to testify; but defense counsel did not call him to testify because he did not want the jury to hear 4 lines of information contained in his report. Attachment "B" to Musick's affidavit is his self-styled original report.[13] The ostensible language from Musick's report professes that Appellant had told his grandmother that young customers at the convenience store had called him cruel names.[14] It further denoted that the last thought of Appellant's mother was that Appellant might have reached his limit after taking years and years of abuse.

¶198 Despite Musick's acknowledgment of counsel's reason for not calling him as a witness at trial, Appellant asserts that Musick's testimony was necessary to explain and personalize the other mitigation evidence which counsel presented. This Court has explicitly rejected the notion that capital defense counsel must use the services of a "mitigation specialist." Marquez-Burrola, 2007 OK CR 14, ¶ 60, 157 P.3d at 767--68. "Defense counsel's decision not to present particular evidence in mitigation may be sound trial strategy." Coddington, 2011 OK CR 21, ¶ 19, 259 P.3d at 839. Similarly, the question of which witnesses to call on a criminal defendant's behalf is a matter of trial strategy. Camron v. State, 1992 OK CR 17, ¶ 32, 829 P.2d 47, 54. An appellant must show that capital defense counsel's strategic decision to not call a witness was objectively unreasonable. Id.; Bobby v. Van Hook, 558 U.S. 4, 9, 130 S.Ct. 13, 17, 175 L.Ed.2d 255 (2009).

¶199 Appellant has not made this showing in the present case. He has neither argued nor shown that counsel's strategic decision to not call Musick as a witness to avoid his being questioned about the 4 lines was objectively unreasonable. We note that these 4 lines were inconsistent with Appellant's first stage defense. We cannot fault counsel for maintaining a consistent defense through both stages of the trial. See Taylor v. State, 2000 OK CR 6, ¶ 48, 998 P.2d 1225, 1237, abrogated on other grounds by Taylor v. State, 2007 OK CR 34, 168 P.3d 185 (refusing to second guess trial counsel's decision to maintain consistent defenses in first and second stage of trial).

¶200 Appellant has also failed to demonstrate prejudice from counsel's decision to not call Musick as a witness. Counsel presented the great majority of the information contained in Dr. Musick's affidavit and Report through the testimony of the numerous witnesses that counsel called during the second stage of the trial. Therefore, much of Musick's testimony would have been cumulative and not likely to have had an immense effect on the jury. At the same time, certain of Dr. Musick's conclusions could be considered detrimental to Appellant's case in mitigation. Musick's conclusion that Appellant killed Henry as a reaction to years and years of bullying was not so compelling as to have shifted the jury's weighing of the evidence in aggravation and mitigation. Nothing in the record suggests that Henry bullied or spoke harshly to Appellant on the night of her death. That Appellant allegedly took out the accumulated pain of years of bullying on an innocent young female that ventured into the store where he was working tends to support the State's theory that Appellant posed a continuing threat to society.

¶201 We also note that Musick's concluding paragraph in his Report speculated that Appellant could continue to engage in impulsive behavior, lack empathy, and be aggressive in the future if his head injuries were left untreated. This information also would have likely tended to support the State's allegation that Appellant posed a continuing threat to society. As the great majority of Musick's information was actually presented to the jury and his ultimate conclusions might have actually supported the State's case, we find that Appellant has not shown a strong possibility that trial counsel was ineffective for failing to utilize or identify the proffered evidence. Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905--906.

¶202 Appellant further asserts in his application that counsel was ineffective for failing to present the testimony of a mental health expert in the second stage of the trial. He, again, refers us to Exhibit "4," the affidavit of Dr. Curtis Grundy. In his untested and unproven affidavit, Dr. Grundy alleges that he could have testified in the second stage of the trial that Appellant met the criteria for diagnosis of schizophrenia. He further alleges that schizophrenia is a severe mental illness that requires ongoing treatment and that he could have testified as to how this condition impaired Appellant's functioning.

¶203 Grundy's proffered statements are cumulative to the testimony he actually gave in the first stage of the trial. Grundy testified that he had diagnosed Appellant as suffering from schizophrenia. He explained that this accounted for his bizarre behavior after his discharge from the Navy, including his hallucinations, delusions, grandiose ideas, paranoia, odd statements to others, and boundary issues, i.e, failure to comply with notions of personal space. Although wholly unnecessary, defense counsel explicitly moved to introduce all of the defense's evidence from the first stage of the trial into evidence in the second stage of the trial. See 21 O.S.2011, § 701.10a (providing that "all exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing shall be admissible in [a] new sentencing proceeding."). Thus, the jury was free to consider Grundy's first stage testimony and there was no reason for defense counsel to call Grundy in the second stage of the trial. We, again, find that Appellant has not shown clear and convincing evidence of a strong possibility that counsel was ineffective for failing to utilize or identify the proffered evidence. Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905--906.

¶204 Appellant further asserts in his application that counsel was ineffective for failing to investigate and present neuro-imaging evidence in both stages of the trial. He cites to two different exhibits to his application in support of this claim.

¶205 Appellant refers us to Exhibit "5" to his application for evidentiary hearing. This exhibit is the affidavit of William Werner Orrison, M.D., the Chief of Neuroradiology at Simon Med Imaging Centers in Las Vegas, New Mexico. Dr. Orrison asserts that he received the MRI data from Appellant's evaluation at the University of Oklahoma Medical Center. He alleges that Appellant has anomalies in four different areas of his brain but does not relate those anomalies to Appellant's behavior in any way. Dr. Orrison does not directly correlate these alleged anomalies with any mental defect disorder, disease, condition or illness. He has not set forth any diagnosis of Appellant. Instead, Dr. Orrison simply relates the problems which can result if a patient has an anatomical abnormality in the specified areas of the brain.

¶206 Appellant further refers us to Exhibit "6" to his application for evidentiary hearing. This exhibit is the affidavit of Jason Paulus Kerkmans, J.D., the Associate Director of MINDSET. Mr. Kerkmans asserts that MINDSET's protocol exam is sufficient to identify a wide range of structural brain abnormalities or deviations which may be of behavioral and clinical significance. He further asserts that additional imaging is necessary because Appellant's current MRI imaging data is not adequate to permit the full MINDSET protocol.

¶207 We find that Appellant has not established prejudice from counsel's omission to present neuro-imaging evidence at trial. The courts have not accepted diagnosis of psychological conditions through neuro-imaging as sufficiently reliable to be admissible under the Daubert standard.[15] See Jason P. Kerkmans, Lyn M. Gaudet, Daubert on the Brain: How New Mexico's Daubert Standard Should Inform Its Handling of Neuroimaging Evidence, 46 N.M.L. Rev. 383, 400-03 (2016) (arguing that novel field of neuro-imaging diagnosis can be recognized by the law despite the number of cases finding it does not meet the standard of admissibility). This is because neuro-imaging methods cannot readily determine whether a defendant knew right from wrong, maintained criminal intent or suffered from a psychological condition like schizophrenia at the time of the criminal act. See Arizona v. Pandeli, 394 P.3d 2, 11 (Ariz. 2017) (finding counsel not ineffective for failing to present brain imaging evidence because experts agreed there was not a good correlation between scans and cognitive ability); United States v. Merriweather, 921 F. Supp.2d 1265, 1284 n. 26, 1300 (N.D. Ala. 2013) (finding brain imaging questionable since medical experts agreed that brain imaging cannot be used to diagnose schizophrenia); United States v. Montgomery, 635 F.3d 1074, 1090 (8th Cir. 2011) (finding PET scan of brain could not be used to diagnosis Pseudocyesis); Brant v. State, 197 So. 3d 1051, 1071 (Fla. 2016) (finding neuro-imaging could not identify abnormalities as cause of criminal acts); Foster v. State, 132 So.3d 40, 58 (Fla. 2013) (distinguishing neuropsychological testing from brain imaging tests of MRI, fMRI and PET scan). Thus, the proffered neuro-imaging evidence would have been cumulative to the other evidence in Appellant's defense.

¶208 As more fully discussed, above, the evidence at trial strongly indicated that Appellant was feigning a severe mental illness. Appellant evinced knowledge of both mental illness and feigning during his impromptu discussion with Officer Brown in the jail. He did not appear to be hallucinating or suffering from delusions immediately after the offense. Multiple psychologists had come to the conclusion that Appellant was over-reporting or feigning mental illness. We are not persuaded that the neuro-imaging evidence would have been able to overcome the compelling evidence of Appellant's sanity.

¶209 We further find that Appellant has not shown prejudice from counsel's omission to present the proffered neuro-imaging evidence in the second stage of the trial. Reweighing the evidence in aggravation against both the mitigating evidence which was presented and the proffered neuro-imaging, we find that Appellant has not shown a reasonable probability that had counsel presented the neuro-imaging evidence the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Williams v. Taylor, 529 U.S. 362, 397--98, 120 S. Ct. 1495, 1515, 146 L. Ed. 2d 389 (2000); Goode v. State, 2010 OK CR 10, ¶ 93, 236 P.3d 671, 688.

¶210 The neuro-imaging evidence would not have contributed greatly to Appellant's case in mitigation. Counsel's omission to present the proffered evidence did not prevent the jury from considering any additional circumstance in mitigation because the neuro-imaging evidence was cumulative to Appellant's other mitigating evidence. The jury was instructed that they were able to consider Appellant's learning disability, the influence of his mental disturbance, his limitation in capacity to appreciate the criminality of his conduct, and his inability to conform his behavior to the requirements of the law among other potential mitigating circumstances. Since the proffered neuro-imaging evidence does not readily correlate to whether Appellant knew right from wrong, maintained criminal intent or suffered from schizophrenia we find that it did not corroborate Dr. Grundy's diagnosis of schizophrenia more adequately than the eyewitness accounts which defense counsel presented. Likewise, the proffered evidence would not have been sufficient to overcome the strong evidence that Appellant had feigned a severe mental illness. The jurors were able to assess Appellant's mental functioning for themselves by listening to his recorded conversation with Detention Officer Kendall Brown.

¶211 The proffered neuro-imaging evidence would not have been sufficient to overcome the State's evidence. As discussed above, the evidence establishing the aggravating circumstances of the murder was compelling. The great weight of the evidence showed that Henry endured conscious physical suffering and severe emotional trauma before dying. Appellant's behavior displayed a pattern of escalating criminal activity and violence. Coupled with the calloused nature of the offense, there was a clear probability that Appellant would continue to constitute a threat to society. Therefore, we conclude that Appellant has not shown clear and convincing evidence of a strong possibility that counsel was ineffective for failing to present neuro-imaging evidence. Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905--906.

¶212 Appellant further asserts in his application that counsel was ineffective for failing to present testimony from his mother and grandmother documenting poignant stories and photographs from his life. He cites to two different exhibits to his application in support of this claim.

¶213 Appellant refers us to Exhibit "7" to his application. This exhibit is the affidavit of his mother, Dana Huff. In the affidavit, Mrs. Huff alleges that had counsel asked her, she would have testified that Appellant's life had value. She would have informed the jury that she loved Appellant and that he loved his siblings. She further alleges that she supplied Appellant's defense team with stories from Appellant's life as well as the 10 photographs attached to her affidavit. Mrs. Huff further alleges that she has sympathy for the victim's family and knows their grief because she had also lost a child.

¶214 Appellant further refers us to Exhibit "8" to his application. This exhibit is the affidavit of his grandmother, Albertha Bench. In the affidavit, Mrs. Bench alleges that had defense counsel called her testify in the second stage of the trial, she would have testified as to her love for Appellant and explained that he had never scared her. She further alleges that she gave defense counsel the photograph attached to her affidavit which depicted Appellant in his Navy uniform prior to trial. Mrs. Bench further alleges that she has sympathy for the victim's family and knows their grief because she had also lost a child.

¶215 Turning to the record, we find that the jury was not deprived of evidence showing that Appellant was a beloved and loving son, grandson and brother. Instead, it is quite clear from the record that Appellant's family loved him. His grandfather, Stanley Bench, testified in the first stage of the trial as to the exchange which occurred when Appellant declared that he was leaving his grandparents' home. Mr. Bench related that Mrs. Bench did not want Appellant to leave so he had advised Appellant; "You better get on out of her because when your grandma comes back, she is liable to have a heart attack." Appellant replied; "Yes, I know." Mr. Bench also testified as to their departing words. Appellant declared; "Pa, I love you. Mr. Bench responded; "I do you too. Be careful out there and don't get hurt.

¶216 Albertha Bench verified Mr. Bench's profession that she loved Appellant when she testified in the first stage of the trial. Mrs. Bench related how she had attempted to care for Appellant. She explained that she had tried to help him overcome strep throat and attempted to assuage his mental health issues while he was living with her.

¶217 Appellant's stepfather, Farlan Huff, testified in the second stage of the trial. Mr. Huff's testimony tended to show how Appellant's family loved him and he loved his family. Mr. Huff related that he had raised Appellant from the age of one-year as if he was his own son. Huff had potty-trained Appellant and taught him how to drive. Mr. Huff also explained that Appellant had sobbed after Mrs. Huff ordered him to stop his violent attack on Mr. Huff. He further related that he had refused to press charges against Appellant because he did not want to split the family up. Mr. Huff made it clear that he still considered himself as Appellant's father.

¶218 Similarly, Dana Huff's testimony in the second stage of the trial made it unmistakably clear that she loved Appellant and wanted him to go on living. She related how she had tried to care for Appellant his entire life. Mrs. Huff testified that she was always proud of her son. She testified concerning Appellant's brother and explained that Appellant had not taken it well when his sister died. While admitting that she was "running interference" for Appellant, Mrs. Huff declared; "He is my child, and I would like to save him."

¶219 We further note that counsel presented other evidence that humanized Appellant. Mrs. Huff testified that Appellant had made friends with an elderly man in a nursing home when he was a teenager. Since his family had abandoned him in the home, Appellant became a companion to the man, went on walks, and shared many conversations with him. Counsel also presented the testimony of Jackie Plese, Appellant's third grade special education teacher. Ms. Plese informed the jury that she had continued to correspond with Appellant while he was in the jail. She regularly sent him Bible passages.

¶220 We further find that the proffered evidence would have undercut counsel's overall second stage strategy of emphasizing the upheaval and dysfunction in his childhood. It appears that counsel had identified and investigated the proffered testimony and photographs. Instead of introducing this evidence at trial, counsel presented evidence tending to show that Appellant was a quiet and sad child who was mistreated both at school and at home because of his learning disability and obsessive compulsive issues. Counsel portrayed Appellant's childhood home as dysfunctional and subject to numerous incidents of upheaval. Since testimony establishing that Appellant had a normal and happy childhood would have undercut the defense's claims of mistreatment and dysfunction, it is clear that counsel made a choice between these two avenues of evidence. As Appellant has neither argued nor shown why counsel's chosen avenue was unreasonable, we find that he has failed to overcome the presumption that counsel's omission of the evidence was an objectively reasonable strategic decision.

¶221 Appellant's allegation that defense counsel should have presented the declarations of Mrs. Huff and Mrs. Bench that each of them had sympathy for the victim's family and knew their grief because each had also lost a child is not well received. As these were the declarations of Appellant's family members, we fail to see how they would have humanized Appellant. Additionally, these declarations were not favorable to Appellant's defense. Every individual's grief over the loss of a loved one is unique and different. Certainly, the grief of Henry's family was different than the grief which Appellant's family members had suffered. Counsel's decision to omit such testimony was more than objectively reasonable. Accordingly, we find that Appellant has not shown clear and convincing evidence of a strong possibility that defense counsel was ineffective for failing to present the proffered photographs and testimony of his mother and grandmother. Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905--906.

¶222 Finally, Appellant asserts in his application that counsel was ineffective for failing to object to the audible gasps in the courtroom when the prosecutor displayed the in-life and post-mortem photographs of Henry during closing argument. Appellant refers us to Exhibit "9" to his application. This exhibit is the affidavit of Dale Anderson, who asserts that he heard audible gasps from the public seating area when these photos were displayed. As Appellant has not raised a claim of ineffective assistance of counsel in his brief predicated upon this assertion, we find that Appellant has waived appellate review of his request for supplementation of the record with this affidavit. Rule 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2017), (setting forth requirement of supporting request for evidentiary hearing with proposition of error alleging ineffective assistance of counsel raised in the brief-in-chief on allegation).

¶223 Appellant has not shown clear and convincing evidence of a strong possibility that counsel was ineffective in any of his claims. Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905--906. Therefore, we find that his Application for Evidentiary Hearing on Sixth Amendment Claim is DENIED.

¶224 Having determined that Appellant is not entitled an evidentiary hearing we turn to the remaining claims of ineffective assistance of counsel set forth in Appellant's Brief. We examine these claims under the test set forth in Strickland but do not consider the supplemental materials attached to Appellant's application. See Bland, 2000 OK CR 11, ¶ 115, 4 P.3d at 731 (holding Rule 3.11 affidavits are not considered part of record on appeal but reviewed only to determine if they contain clear and convincing evidence of counsel's ineffectiveness).

¶225 Appellant argues that counsel was ineffective for failing to impeach Melissa Lynn and Dr. Hall; failing to present the testimony of a mitigation specialist and a mental health expert, failing to present neuro-imaging evidence; and failing to present the value of Appellant's life through the testimony of his mother and grandmother. Nothing in the record supports these claims, thus, we find that Appellant has not shown ineffective assistance of counsel under the more rigorous federal standard set forth in Strickland. Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 906. Proposition IV is denied.

ACCUMULATION OF ERROR CLAIM

¶226 In Proposition XII, Appellant contends that, even if no individual error merits reversal, the cumulative effect of such errors warrants either reversal of his conviction or a modification of his death sentence. Reviewing the entire record in the present case, we find that Appellant was not denied a fair trial or sentencing proceeding by egregious or numerous errors. Williams v. State, 2001 OK CR 9, ¶ 127, 22 P.3d 702, 732; Bechtel v. State, 1987 OK CR 126, ¶ 12, 738 P.2d 559, 561. Therefore, no new trial or modification of sentence is warranted and this proposition of error is denied.

MANDATORY SENTENCE REVIEW

¶227 In Proposition XI, Appellant contends that arbitrary factors determined his death sentence. We consider this argument in conjunction with our mandatory sentence review pursuant to 21 O.S.2011, § 701.13.

¶228 The State alleged and the jury found the presence of two aggravating circumstances: 1) the murder was especially heinous, atrocious, or cruel; and 2) the defendant posed a continuing threat to society. In Propositions VIII and IX, we determined that the State presented sufficient evidence to support the jury's finding of these two aggravating circumstances.

¶229 Appellant alleged the following circumstances in mitigation of punishment: (1) he did not have any prior violent felony convictions; (2) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired; (3) he was under the influence of mental disturbance at the time of the crime; (4) he acted under circumstances which tended to justify, excuse or reduce the crime; (5) he is likely to be rehabilitated; (6) he fully cooperated with the police when he was arrested; (7) he is only 23 years old today and was only 21 years old at the time of the offense; (8) he was diagnosed with a learning difficulty at an early age; (9) he was bullied, teased, and made fun of in school; (10) he had a negative emotional and family history; (11) he had suicidal thoughts when he was 13 years of age; (12) he was physically and verbally abused as a child; (13) he wanted to serve in the United States Navy, but was unable to complete requirements for such service; and (14) he was presented for mental health treatment and was denied.

¶230 Appellant presented the testimony of 18 witnesses in the sentencing stage of the trial, including his friends, neighbors, educators, family members, representatives of the Navy, and an administrator from a health care program. In addition to the evidence in mitigation detailed in Propositions IV and VI, the evidence showed that Appellant had a learning disability and had always struggled in the classroom. He participated in special education classes in school where it was determined that he had a normal intelligence quotient but experienced processing delays. By the eighth grade Appellant was very determined to get out of the special education classes. Due to his hard work he was able to transfer to a co-taught classroom in the Eighth grade. He was also able to accomplish his personal goal of making the school football team. Appellant's teachers found him to be respectful, quiet and polite.

¶231 The evidence further showed that Appellant's delays impacted his personal relationships. Appellant's family, neighbors, teachers and friends testified concerning his childhood. Some of Appellant's peers picked on him. He had a few friends but otherwise spent much of his time alone. Appellant was awkward around girls. Farlan Huff struggled to deal with Appellant's limitations, belittled him, and harshly disciplined him. This caused tension between them. Both Dana Huff and Farlan Huff had worked with Appellant to help him hide the fact that he was different. They encouraged Appellant to enter the military because they believed that this would fix him.

¶232 The evidence also showed that certain individuals cared for Appellant and maintained a positive relationship with him despite the passage of time. Anthony Popovich, Appellant's best friend from childhood, maintained a relationship with Appellant even after Appellant moved away. Jackie Plese, one of Appellant's instructors, continued to correspond with Appellant after his arrest and incarceration for Henry's murder. Appellant's maternal grandparents, Stanley and Albertha Bench, also cared for Appellant.

¶233 Appellant supplemented the evidence from the first stage indicating that he had psychological issues with lay witness testimony. This evidence showed that he was diagnosed with attention deficit hyperactivity disorder as a child and had nightmares of a dark figure. As a teenager he engaged in obsessive handwashing and was diagnosed with compulsive personality disorder. He had to stop taking the medication prescribed to help him focus when he started to think about harming himself. Chief Southerland testified that he had sent Appellant to a psychiatrist for evaluation during his time in the Navy.[16] Appellant exhibited signs of paranoia after the Navy discharged him. Farlan Huff tried to get him help at several mental health clinics but they turned Appellant away. A representative from the program in Ada corroborated Farlan Huff's assertion that Appellant was turned away from that program.

¶234 Based upon the record before us, we find the sentence of death to be factually substantiated and appropriate. Malone, 2013 OK CR 1, ¶¶ 79-87, 293 P.3d at 218-21; Eizember, 2007 OK CR 29, ¶ 145, 164 P.3d at 242. Reviewing the record, we cannot say the trier of fact was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.2011 § 701.13(C) in finding that the aggravating circumstances outweighed the mitigating evidence. Id. We affirm the sentence of death. 21 O.S.2011, § 701.13(E). Accordingly, finding no error warranting reversal or modification, this appeal is denied.

DECISION

¶235 The Judgment and Sentence is hereby AFFIRMED. The Application for Evidentiary Hearing on Sixth Amendment Claim is DENIED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2018), the MANDATE is ORDERED issued upon the delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF STEPHENS COUNTY
THE HONORABLE G. BRENT RUSSELL
ASSOCIATE DISTRICT JUDGE

 
 
 
 APPEARANCES AT TRIAL
 
 
 APPEARANCES ON APPEAL
 
 
 
 
 
 MITCHELL SOLOMON
 SHEA SMITH
 CAPITAL TRIAL DIVISION
 OKLA INDIGENT DEFENSE
 P.O. BOX 926
 NORMAN, OK 73070
 COUNSEL FOR DEFENDANT
 
 
 
 TRACI J. QUICK
 KATRINA CONRAD-LEGLER
 HOMICIDE-DIRECT APPEALS
 OKLA INDIGENT DEFENSE
 P.O. BOX 926
 NORMAN, OK 73070
 COUNSEL FOR APPELLANT
 
 
 
 
 
 JASON HICKS
 DISTRICT ATTORNEY
 LEAH EDWARDS
 ASST DISTRICT ATTORNEY
 101 SOUTH 11TH STREET
 DUNCAN, OK 73533
 COUNSEL FOR THE STATE
 
 
 
 MIKE HUNTER
 ATTY GENERAL OF OKLAHOMA
 CAROLINE E.J. HUNT
 ASST ATTORNEY GENERAL
 313 N.E. 21ST ST.
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR THE STATE
 
 
 

OPINION BY: LUMPKIN, P.J.

LEWIS, V.P.J.: Concur
HUDSON, J.: Concurring in Results
KUEHN, J.: Specially Concurring
ROWLAND, J.: Concur

FOOTNOTES

[1] Appellant filed his Petition in Error on October 22, 2015. He filed his Brief on February 28, 2017. The State filed its Brief on June 28, 2017. The case was submitted to the Court on July 18, 2017. Oral argument was held on March 7, 2018.

[2] Two articles appear to reference Appellant's graduation from high school. In addition, two of the articles are simply publications of Henry's obituary.

[3] Appellant's list of article titles includes articles from news9.com, koco.com, kfor.com and Newsok.com in Oklahoma City, Oklahoma; tulsaworld.com and ktul.com in Tulsa, Oklahoma; The Shawnee News-Star in Shawnee, Oklahoma; The Durant Democrat in Durant, Oklahoma; The Republic in Columbus, Indiana; the SFGATE in San Francisco, California; the Newstimes in Danbury, Connecticut; The Chron in Houston, Texas; Mail Online from the United Kingdom; and a non-english cinema website ("onlinetamilcinema.com") in South India.

[4] See Wn.com; freenewspapers.com; and Examiner.com.

[5] See Cafemom.com; websleuths.com; cncpunishment.com; wittyprofiles.com.

[6] The article "How we got the bum's rush," did not demonize Appellant, instead, it alleged that the District Court had violated the constitution when the article's author attempted to enter a closed pretrial hearing and was escorted from the courtroom.

[7] One of the attached articles was a piece by a national author recounting how things had changed in Duncan, the county seat of Stephen's county and location of Appellant's trial. The article cited to the murder of a foreign college athlete, the shooting of a local donkey, and the downturn in the stores on Main street. Two of the attached articles were from local individuals contesting the national author's portrayal of Duncan. We see little, if any, relevance between these articles and the subject at issue.

[8] The District Court also excused 4 individuals who were either friends with Henry's family or had a family member who was a friend of Henry or her family.

[9] But see, contra Willingham v. State, 1997 OK CR 62, ¶¶ 20--27, 947 P.2d 1074, 1080--1081 (second degree murder is not a lesser included offense of first degree murder), overruled in part by Shrum, 1999 OK CR 41, ¶ 10, 991 P.2d at 1036. I concurred in Willingham but previously acceded to this interpretation in an effort to give the trial bench and bar a bright line to apply in determining lesser included offenses as to first degree murder. Grissom v. State, 2011 OK CR 3, ¶ 4, 253 P.3d 969, 997 (Lumpkin J., Specially Concurring).

[10] Since this Court decided Lewis v. State, 1998 OK CR 24, 970 P.2d 1158, the Legislature has amended Section 2703 to add that facts or data otherwise inadmissible "shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." 12 O.S.Supp.2013, § 2703.

[11] It is not entirely certain that the court reporter precisely captured the prosecutor's argument. I note that there are numerous instances within the transcripts which give the reader a vague sense that a word was inexactly captured.

[12] Appellant's suggestion that members of the public gasped when the prosecutor displayed the photo next to an image depicting Henry's facial injuries is not supported by the record. The affidavit which he references is not part of the record and we do not consider it. Bland, 2000 OK CR 11, ¶ 115, 4 P.3d at 731.

[13] Attachment "A" is Dr. Musick's Curriculum Vita and Attachment "C" appears to be a diagram of the family dynamics in Appellant's family.

[14] Evincing the unproven nature of the exhibit, Appellant and the State debate whether Dr. Musick's attribution of this statement to Appellant's grandmother was accurate.

[15] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[16] The psychiatrist determined that Appellant was ready and fit for duty

HUDSON, J., CONCURRING IN RESULTS:

¶1 I concur with the decision to affirm Appellant's first degree murder conviction and death sentence. I write separately to clarify in Proposition Five that the evidence test adopted in Shrum v. State, 1999 OK CR 41, 991 P.2d 1032, is binding precedent in Oklahoma. Its holding is simple: "all lesser forms of homicide are necessarily included and instructions on lesser forms of homicide should be administered if they are supported by the evidence." Id., 1999 OK CR 41, ¶ 10, 991 P.2d 1032, 1036. Accord Tryon v. State, 2018 OK CR 20, ¶ 66, 423 P.3d 617, 638 ("In a first degree murder case, the trial court should instruct on any lesser form of homicide supported by the evidence."). Thus, whether a lesser form of homicide is warranted is a fact-dependent issue, and hence, must be decided on a case by case basis. State v. Tubby, 2016 OK CR 17, ¶ 1, 387 P.3d 918, 922 (Hudson, J., Specially Concur). The pivotal question in the analysis is whether prima facie evidence was presented that "would allow a jury rationally to find the accused guilty of the lesser offense and acquit him of the greater." Tryon, 2018 OK CR 20, ¶ 66, 423 P.3d at 638.

¶2 The majority's statement that second degree murder has historically been considered a lesser included offense of first degree malice murder "is superfluous . . . the legal determination is already made, and the trial court need only look to the evidence to determine whether instructions on lesser forms of homicide are supported." Davis v. State, 2011 OK CR 29, ¶ 2, 268 P.3d 86, 141 (Lewis, V.P.J., concurring in results). The issue is whether prima facie evidence of the lesser offense was presented at trial warranting instruction on the lesser included or lesser related offense. See Tryon, 2018 OK CR 20, ¶¶ 68-69, 423 P.3d at 638. The majority's approach is contrary to this Court's binding legal precedent and confuses the issue for the bench, bar and public. I agree, however, that insufficient evidence was presented in this case to support instruction on second degree murder under the governing test.

KUEHN, J., SPECIALLY CONCURRING:

¶1 I agree that Appellant's conviction and sentence should be affirmed, but write to discuss Propositions V and VI in more detail.

¶2 Regarding Proposition V, I agree the evidence did not warrant instructions on Second Degree Depraved Mind Murder, but I believe the Majority's analysis is overly complicated. I agree that even in capital cases, a trial court is not required to instruct the jury on any lesser (non-capital) option unless the evidence reasonably supports it. Beck v. Alabama, 447 U.S. 625, 637, 100 S.Ct. 2382, 2389, 65 L.Ed.2d 392 (1980); Spaziano v. Florida, 468 U.S. 447, 455-56, 104 S.Ct. 3154, 3159-60, 82 L.Ed.2d 340 (1984).[1] That determination is based on state law. Hopkins v. Reeves, 524 U.S. 88, 90-91, 118 S.Ct. 1895, 1898, 141 L.Ed.2d 76 (1998). We have rejected the strict "elements" approach to deciding whether it is appropriate to instruct on lesser offenses. Shrum v. State, 1999 OK CR 41, 991 P.2d 1032.[2] Instead, we consider (1) whether a reasonable view of the evidence meets all elements of the lesser option, and if so, (2) whether a rational juror could have acquitted Appellant of the greater option and convicted him of the lesser -- in other words, whether a rational juror could have disregarded any evidence or element that distinguishes the greater from the lesser. McHam v. State, 2005 OK CR 28, ¶ 21, 126 P.3d 662, 670; Shrum, 1999 OK CR 41, ¶ 6 n. 2, 991 P.2d 1032, 1034 n. 2.

¶3 The question presented here is whether any rational juror could have viewed Appellant's conduct as imminently dangerous and evincing a depraved mind in extreme disregard of human life, but not done with the intention of taking the life of any particular person. See OUJI-CR (2nd) No. 4-91 (elements of Depraved Mind Murder).[3] The Majority makes reference to "shooting into a crowd" as a textbook example of conduct evincing a depraved mind, but the fact that Appellant committed violence against only one person does not categorically render him ineligible for an instruction on this lesser offense.[4] Nevertheless, I find that from the totality of the evidence, no rational juror could have concluded that Appellant acted with anything less than an intent to kill.

¶4 First, Appellant's own statements indicate that he intended to kill. At times he suggested that he had delusions about who the victim was, and at times he appeared to be feigning mental illness to escape liability. Regardless, the statements reasonably suggest that Appellant intended to cause the death of the victim. Second, the nature of the victim's injuries, and the sequence of these horrible events, leave no doubt in my mind that Appellant acted with decidedly more than "extreme disregard for human life." The Medical Examiner testified that the victim suffered repeated and extensive blunt force trauma to her head and torso, as well as bruising to her extremities. In short, it appeared that Appellant repeatedly stomped his victim until she died. What is more, he admitted to Dr. Grundy that after his first attack on the victim, he returned and attacked her a second time. The evidence suggested that the victim was conscious for some part of the attack, and fought back as best she could. The evidence also indicated that Appellant dragged her body across the floor while she was still conscious. The point here is not just that the attack was brutal and cruel; it clearly was. The point is that Appellant's extensive and protracted attack, and Henry's defensive attempts, convince me that no rational juror could have found any intent on Appellant's part but to kill her. The trial court properly rejected instructions on Depraved Mind Murder.

¶5 In Proposition VI, the Majority finds that the State's mental-health expert, Dr. Terese Hall, did not improperly comment on the veracity of other witnesses, but cautions that she came "dangerously close" to doing so at one point. I believe Dr. Hall's testimony was proper in all respects. Witnesses with specialized training and experience are often asked to explain why they find certain information noteworthy or credible.[5] Expert witnesses are permitted to base their conclusions on evidence that may not otherwise be admissible, such as hearsay. 12 O.S.2011, § 2703; Studie v. State, 1985 OK CR 124, ¶ 9, 706 P.2d 1390, 1391. They may be asked to disclose the underlying facts supporting their conclusions. 12 O.S.2011, § 2705; Lewis v. State, 1998 OK CR 24, ¶ 19, 970 P.2d 1158, 1166-67. Indeed, an expert's opinion may be excluded if it is not supported by the facts. Casady v. State, 1986 OK CR 114, ¶ 16, 721 P.2d 1342, 1346.

¶6 Sanity is not determined by a litmus test; it relies on a compilation of information, much of it coming from lay people who have observed the subject's behavior over time. Thus, explaining the basis for an opinion on sanity necessarily includes a direct or indirect assessment of others' credibility, more than opinions based on "harder" science might. Here, both parties probed the bases for both experts' opinions, asking each what they considered, and what they considered probative. If the prosecutor had not asked Dr. Hall to explain her conclusion in the face of contradictory information, defense counsel was sure to do so in cross-examination.[6]

 

¶7 As the Majority notes, "vouching" is when a witness or attorney makes personal assurances to jurors about the credibility of a witness, based on information not actually presented to them. See Simpson v. State, 2010 OK CR 6, ¶¶ 35-36, 230 P.3d 888, 901. There was no vouching here. Not only was the basis for Dr. Hall's assessment (the consistency of family observations) easy to understand, but the key sources of that information (Appellant's grandmother and cousin) themselves testified before the jury, and were specifically asked whether their assessments of Appellant's mental health had changed over time.[7] Dr. Hall did not judge any witness's credibility using some secret formula or undisclosed fact. She simply told the jury how she reached her own conclusions. The credibility of all witnesses (including Dr. Hall) was left for the jury to determine. There was nothing improper in Dr. Hall's testimony.

FOOTNOTES

[1] Overruled on other grounds, Hurst v. Florida, 577 U.S. --, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016).

[2] In fact, with regard to homicides, we rejected that notion more than a century ago. Our early cases treated all murders and manslaughters as degrees of "felonious homicide," even though their intent elements are dissimilar and, at times, mutually exclusive. See Rhea v. Territory, 1909 OK CR 153, 105 P. 314, 316 (affirming manslaughter conviction for defendant charged with premeditated murder); Smith v. Territory, 1904 OK 53, 77 P. 187, 188 (upholding conviction for second-degree manslaughter on a charge of murder).

[3] The statutory text defines Depraved Mind Murder as a homicide "perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." 21 O.S.2011, § 701.8(1).

[4] E.g. Palmer v. State, 1994 OK CR 16, 871 P.2d 429 (evidence supported conviction for depraved-mind murder, where defendant gave the victim a dose of very potent cocaine, knowing that the victim had suffered a severe reaction to cocaine two weeks earlier).

[5] E.g. Simpson v. State, 2010 OK CR 6, ¶¶ 35-36, 230 P.3d 888, 901 (detective did not vouch for witness credibility by commenting on inconsistencies among statements of the accused and his co-defendants, or by pointing out that another witness had given police previously-unknown information).

[6] The prosecutor cross-examined Dr. Grundy about information he had discounted or failed to consider. In fact, the questions that the prosecutor asked Dr. Hall on direct were similar to those she had previously asked Grundy -- what he thought about the changes in the grandparents' accounts, and why he discounted Clayton Jenson's observations. Defense counsel himself asked Dr. Grundy "what weight did you give" to certain information, and even asked him whether a particular observation related by Appellant's grandmother was "significant in this case." The prosecutor's questions to Dr. Hall were not substantively different from defense counsel's own questions to Dr. Grundy (e.g.: "Tell me about what weight, if any, you gave to Mr. Bench's family members and their assertion of events"). In fact, as the Majority notes, Dr. Hall was quite transparent in her assessment: "I think Dr. Grundy considered [Appellant's] family information that was offered later to be highly credible and I did not. I think that is the main difference [in our opinions]." Dr. Hall even noted that Dr. Grundy used to be her supervisor, and that this was the rare case where their diagnoses diverged.

[7] While the jury did not hear testimony from Dallas Cowen, the jail administrator, that brief description of Appellant's behavior was only related by Dr. Hall to corroborate her own first-hand observations. Dr. Hall testified that after a long psychological interview where Appellant claimed his jailers were trying to poison him, she overheard him casually ask his jailers for a double cheeseburger. Dr. Hall testified that Cowen had made similar observations (claiming Appellant acted normally until a lawyer or doctor came to visit him). I also note that while Appellant complains Dr. Hall said she took the grandparents' latter accounts with "a grain of salt," that phrase was actually suggested by the prosecutor.

 






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1977 OK CR 83, 561 P.2d 88, DENNIS v. STATE
Discussed
 1988 OK CR 238, 763 P.2d 703, McKAY v. CITY OF TULSA
Discussed
 1989 OK CR 70, 781 P.2d 843, PUGH v. STATE
Discussed
 1990 OK CR 56, 796 P.2d 1176, LAWRENCE v. STATE
Discussed
 1991 OK CR 66, 813 P.2d 526, LANGLEY v. STATE
Discussed at Length
 1991 OK CR 72, 815 P.2d 676, CRUMLEY v. STATE
Discussed
 1991 OK CR 121, 824 P.2d 364, BERGET v. STATE
Discussed
 1992 OK CR 17, 829 P.2d 47, CAMRON v. STATE
Discussed
 1992 OK CR 60, 840 P.2d 18, CLAYTON v. STATE
Discussed at Length
 1993 OK CR 8, 847 P.2d 368, ROMANO v. STATE
Discussed
 1993 OK CR 41, 862 P.2d 1273, HOOKS v. STATE
Discussed at Length
 1994 OK CR 16, 871 P.2d 429, PALMER v. STATE
Discussed
 1994 OK CR 40, 876 P.2d 690, SIMPSON v. STATE
Discussed at Length
 1994 OK CR 44, 887 P.2d 1288, MAYES v. STATE
Discussed at Length
 1994 OK CR 61, 881 P.2d 755, TAYLOR v. STATE
Cited
 1994 OK CR 69, 896 P.2d 537, NEILL v. STATE
Discussed
 1994 OK CR 73, 885 P.2d 670, NICKELL v. STATE
Discussed
 1995 OK CR 14, 891 P.2d 1283, SCOTT v. STATE
Discussed
 1995 OK CR 17, 890 P.2d 980, MARQUEZ v. STATE
Discussed
 1995 OK CR 42, 909 P.2d 783, BRAUN v. STATE
Discussed at Length
 1995 OK CR 60, 907 P.2d 217, SMALLWOOD v. STATE
Discussed at Length
 1995 OK CR 72, 909 P.2d 74, CHENEY v. STATE
Discussed
 1995 OK CR 74, 909 P.2d 92, ROMANO v. STATE
Discussed at Length
 1995 OK CR 80, 911 P.2d 286, OMALZA v. STATE
Discussed
 1996 OK CR 26, 919 P.2d 1130, HAIN v. STATE
Discussed at Length
 1909 OK CR 153, 105 P. 314, 3 Okl.Cr. 230, Rhea v Territory
Discussed
 2001 OK CR 3, 19 P.3d 866, 72 OBJ 388, PICKENS v. STATE
Discussed
 2001 OK CR 9, 22 P.3d 702, 72 OBJ 1068, WILLIAMS v. STATE
Discussed at Length
 1999 OK CR 41, 991 P.2d 1032, Shrum v. State
Discussed at Length
 2002 OK CR 40, 60 P.3d 4, McELMURRY v. STATE
Discussed
 2004 OK CR 1, 84 P.3d 731, HARRIS v. STATE
Discussed
 2004 OK CR 19, 89 P.3d 1124, DEROSA v. STATE
Discussed at Length
 2004 OK CR 35, 103 P.3d 590, GARRISON v. STATE
Discussed
 2005 OK CR 28, 126 P.3d 662, McHAM v. STATE
Discussed
 2006 OK CR 7, 130 P.3d 287, ROJEM v. STATE
Discussed
 2006 OK CR 10, 132 P.3d 1, JONES v. STATE
Discussed
 2006 OK CR 8, 134 P.3d 816, BROWNING v. STATE
Discussed
 2006 OK CR 34, 142 P.3d 437, CODDINGTON v. STATE
Cited
 2006 OK CR 40, 144 P.3d 838, WARNER v. STATE
Discussed
 2006 OK CR 47, 152 P.3d 217, ROY v. STATE
Discussed
 2007 OK CR 9, 155 P.3d 796, HANCOCK v. STATE
Discussed at Length
 2007 OK CR 12, 157 P.3d 143, GLOSSIP v. STATE
Discussed at Length
 2007 OK CR 14, 157 P.3d 749, MARQUEZ-BURROLA v. STATE
Discussed at Length
 2007 OK CR 19, 159 P.3d 272, PAVATT v. STATE
Discussed
 2007 OK CR 24, 163 P.3d 596, JACKSON v. STATE
Discussed
 2007 OK CR 27, 164 P.3d 1089, COLE v. STATE
Discussed at Length
 2007 OK CR 29, 164 P.3d 208, EIZEMBER v. STATE
Discussed at Length
 2007 OK CR 34, 168 P.3d 185, MALONE v. STATE
Discussed
 2009 OK CR 7, 204 P.3d 777, HORN v. STATE
Discussed
 2009 OK CR 11, 205 P.3d 1, GRANT v. STATE
Discussed
 2010 OK CR 6, 230 P.3d 888, SIMPSON v. STATE
Discussed at Length
 2010 OK CR 10, 236 P.3d 671, GOODE v. STATE
Discussed
 2010 OK CR 14, 235 P.3d 640, MITCHELL v. STATE
Discussed at Length
 2010 OK CR 23, 241 P.3d 214, CUESTA-RODRIGUEZ v. STATE
Discussed
 2011 OK CR 1, 252 P.3d 214, DAWKINS v. STATE
Discussed
 2011 OK CR 6, 248 P.3d 918, HARMON v. STATE
Discussed at Length
 2011 OK CR 12, 252 P.3d 221, UNDERWOOD v. STATE
Discussed
 2011 OK CR 3, 253 P.3d 969, GRISSOM v. STATE
Discussed at Length
 2011 OK CR 21, 259 P.3d 833, CODDINGTON v. STATE
Cited
 2011 OK CR 26, 270 P.3d 160, MITCHELL v. STATE
Cited
 2011 OK CR 29, 268 P.3d 86, DAVIS v. STATE
Discussed at Length
 2011 OK CR 30, 267 P.3d 114, POSTELLE v. STATE
Discussed at Length
 2012 OK CR 5, 272 P.3d 720, JOHNSON v. STATE
Discussed
 2012 OK CR 7, 274 P.3d 161, NELOMS v. STATE
Discussed at Length
 2012 OK CR 9, 280 P.3d 337, BUSH v. STATE
Discussed at Length
 2013 OK CR 1, 293 P.3d 198, MALONE v. STATE
Discussed at Length
 2013 OK CR 8, 303 P.3d 291, DAY v. STATE
Discussed
 2015 OK CR 11, 358 P.3d 280, SANDERS v. STATE
Discussed at Length
 2016 OK CR 3, 371 P.3d 1100, MARTINEZ v. STATE
Discussed at Length
 2016 OK CR 9, 372 P.3d 508, STEWART v. STATE
Discussed
 2016 OK CR 15, 387 P.3d 915, TOLLETT v. STATE
Discussed
 2016 OK CR 17, 387 P.3d 918, STATE v. TUBBY
Discussed at Length
 2018 OK CR 6, 419 P.3d 265, TAYLOR v. STATE
Cited
 2018 OK CR 10, 421 P.3d 890, NICHOLSON v. STATE
Discussed
 2018 OK CR 15, 422 P.3d 752, WILLIAMSON v. STATE
Discussed
 2018 OK CR 20, TRYON v. STATE
Discussed at Length
 2000 OK CR 6, 998 P.2d 1225, 71 OBJ 578, Taylor v. State
Discussed
 2000 OK CR 10, 1 P.3d 1006, 71 OBJ 1303, Childress v. State
Discussed
 2000 OK CR 11, 4 P.3d 702, 71 OBJ 1304, Bland v. State
Discussed at Length
 2000 OK CR 20, 13 P.3d 489, 71 OBJ 2675, Harris v. State
Discussed
 1975 OK CR 148, 538 P.2d 1080, STATE v. THOMASON
Discussed
 1963 OK CR 67, 384 P.2d 54, BROWN v. STATE
Discussed at Length
 1951 OK CR 145, 237 P.2d 459, 94 Okl.Cr. 425, MARKS v. STATE
Discussed
 1982 OK CR 107, 648 P.2d 843, WILLIAMS v. STATE
Discussed at Length
 1970 OK CR 171, 476 P.2d 362, GIBSON v. STATE
Discussed
 1997 OK CR 24, 937 P.2d 101, Robinson v. State
Discussed
 1997 OK CR 62, 947 P.2d 1074, 68 OBJ 3542, Willingham v. State
Discussed
 1997 OK CR 71, 951 P.2d 98, 68 OBJ 3891, Gilbert v. State
Discussed
 1998 OK CR 24, 970 P.2d 1158, 69 OBJ 1501, Lewis v. State
Discussed at Length
 1998 OK CR 33, 965 P.2d 955, 69 OBJ 2028, Turrentine v. State
Discussed at Length
 1998 OK CR 39, 964 P.2d 875, 69 OBJ 2421, Jackson v. State
Discussed
 1998 OK CR 66, 973 P.2d 270, 69 OBJ 4283, Patton v. State
Discussed
 1984 OK CR 15, 674 P.2d 569, SMITH v. STATE
Discussed
 1999 OK CR 23, 990 P.2d 277, 70 OBJ 1591, Dennis v. State
Discussed
 1999 OK CR 37, 989 P.2d 998, Bernay v. State
Discussed
 1985 OK CR 8, 695 P.2d 858, VILLANUEVA v. STATE
Discussed
 1985 OK CR 124, 706 P.2d 1390, STUDIE v. STATE
Discussed
 1986 OK CR 114, 721 P.2d 1342, CASADY v. STATE
Discussed
 1987 OK CR 126, 738 P.2d 559, BECHTEL v. STATE
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1904 OK 53, 77 P. 187, 14 Okla. 162, SMITH v. TERRITORY OF OKLAHOMA
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 2401, Relevant Evidence Defined
Cited
 12 O.S. 2403, Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion or Cumulative Nature of Evidence
Discussed at Length
 12 O.S. 2703, Bases of Opinion Testimony by Experts
Discussed at Length
 12 O.S. 2705, Disclosure of Facts or Data Underlying Expert Opinion
Discussed
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 112, 21 O.S. 112, Definition - Sexual Assault
Cited
 21 O.S. 701.7, Murder in the First Degree
Cited
 21 O.S. 701.8, Second Degree Murder
Discussed
 21 O.S. 701.10a, Death Penalty Sentencing Procedure Upon Remand - Evidence - Applicability - Construction
Cited
 21 O.S. 701.13, Review of Death Penalty Sentence
Discussed at Length
 21 O.S. 1123, Lewd or Indecent Proposals or Acts to Child Under 16
Cited
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 561, Change of Venue - Application - Affidavits - Several Defendants
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA